Opinion for the court by Associate Judge FERREN.
Concurring Opinion by Senior Judge MACK at p. 862.
Dissenting Opinion by Associate Judge STEADMAN at p. 866.
Table of Contents
Page
INTRODUCTION. 840
I. Facts and Proceedings. 840
II. Summary of Decision. 842
*840 Page
III. Whether An Unmarried Couple Is Eligible To Adopt A Child. CO 00
A. Preliminary Observation: How To Conceptualize This Case. CO Tp 00
B. Applicable Statutory Provisions and the the Trial Judge’s Ruling. CO TP 00
C. Rules For Statutory Interpretation. id Tp 00
D. Adoptions By Unmarried Couples: Language of the Adoption Statute, and the Statutory Rule of Construction in D.C.Code § 49-202 . CD ^ 00
E. Adoptions By Unmarried Couples: Legislative History. 05 TP 00
F. Adoptions By Unmarried Couples: Canons of Statutory Construction and “Strict” v. “Liberal” Construction. H ID 00
1. Expressio Urdus . H ID 00
2. Strict Construction. CO ID 00
G. Adoptions By Unmarried Couples: Other Interpretative Criteria — “Absurd Results” and “Obvious Injustice”. Tp ID 00
H. Adoptions By Unmarried Couples: A Final Interpretative Criterion— “Legislative Purpose”. TP ID 00
1. Legislative Intent. ID ID 00
2. Statutory Purpose. <D LD 00
I. Adoptions By Unmarried Couples: Furthering the Statutory Purpose By Achieving the Child’s Best Interests. CID 00
IV. Whether An Adoptive Parent’s Relationship With the Child Will Be Cut Off If That Parent’s Unmarried Life Partner is Permitted To Adopt 05 ID 00
A. The “Stepparent Exception” . 05 ID 00
B. Rejection of Possible Alternative Analysis. 1 — I íO 00
V. Conclusion. O 00
FERREN, Associate Judge:
This case presents the question whether, under District of Columbia law, two unmarried persons — in particular, a same-sex couple living together in a committed personal relationship — may adopt a child. If the answer is yes, there is a second question: whether the fact that one member of the couple already has adopted the child creates any impediment to both members’ joining in the adoption. We answer the first question “yes,” the second question “no.” The trial judge erred in answering each question but intimated that the adoption would be in the child’s “best interests” if the law were otherwise — as we hold it here to be. We therefore reverse and remand for issuance of factual findings and, if still indicated, for entry of a decree granting the adoption appellants seek.
I. Facts and Proceedings
We quote the statement of facts from the trial judge’s opinion (footnotes omitted):
Hillary is a healthy, happy, and delightful 2]é year-old Black/Hispanic child who was born on August 15,1991 in the District of Columbia. Hillary’s biological mother is a young, attractive Black woman who met Bruce and Mark after reading an advertisement that they had placed in a local newspaper. The ad identified the petitioners as a gay couple who were seeking to adopt a child. Bruce and Mark are adult, white, homosexual males who have shared an intimate relationship for almost five years.
At the time she read the newspaper advertisement, the birth mother was several months pregnant and was not on good terms with her mother with whom she then lived. The birth mother, therefore, not only answered the ad, but shortly after meeting the petitioners, she began living with them. Eventually, she delivered Hillary on August 15, 1991. All went as planned when Hillary’s mother signed her consent to an adoption of Hillary on September 9, 1991. Bruce filed the first petition to adopt the child on the following day.
The baby’s natural mother and Bruce reached an agreement that the mother would continue to have visitation privileges with Hillary, even after the adoption was finalized. These visitation arrangements, however, did not proceed smoothly. Rather, the mother accused Bruce of denying her access to Hillary and eventually she filed a motion to vacate her consent to the *841 adoption. This motion was submitted to this court and was scheduled for a hearing.
After much discussion and several preliminary hearings, the parties reached an accord which they reduced to writing. Essentially, Hillary’s mother and Bruce agreed again to permit the mother to visit with Hillary even after a final decree of adoption was issued.
In them discussion with the court about this agreement, the parties expressly stated that they understood that under the District of Columbia law, the natural mother had no enforceable right to visit Hillary after a final decree of adoption was signed because the law in the District of Columbia, as the parties understood it, mandated that upon the signing of the final decree of adoption, all of the mother’s rights as a parent would be terminated. No one suggested that this severance of Hillary’s mother’s rights was waivable. At the parties’ request, this court reviewed the agreement and satisfied itself that the natural mother understood that she was in no way obligated to settle the case; that she could instead proceed with the hearing on her motion to vacate her consent; and that the agreement to allow continued visitation with Hillary could not be enforced under the law as it existed in the District of Columbia. This court was further satisfied that the mother’s decision to reaffirm her consent to the adoption and to withdraw her motion to vacate her consent was voluntarily made. Therefore, since all of the evidence supported a finding that Bruce M. was a suitable person to adopt Hillary, and since Hillary was clearly suitable to be adopted, and because this court found that the adoption was in Hillary’s best interest, this court signed the final decree of adoption in favor of Bruce M.[1]
In March 1993, both Bruce M. and Mark D. petitioned to adopt Hillary. In addition, Bruce M. signed his consent to the petition to adopt in favor of himself and Mark D.
The petitioners, Bruce and Mark, are thirty and thirty-five respectively. They
are both Catholics who are members of a gay and lesbian religious organization called Dignity. Brace has a Bachelor’s Degree in Electrical Engineering and a Master’s Degree in Engineering Computer Science. He currently works as an engineer for a major corporation. Mark has a Bachelor’s Degree in Political Science and a Master’s Degree in Public Administration. He now works as a Court Administrator in the state of Pennsylvania.
The petitioners own a condominium that they bought jointly and have shared since 1990. They have committed themselves to each other as a family to the extent legally possible, and they seek to raise Hillary together, whether or not their joint petition to adopt her is approved. They have, for example, introduced Hillary to, and included her as, a part of both of them extended families. They shared in her baptism at their church. They have enrolled her in a monthly play group arranged by the Gay and Lesbian Parent Coalition of Washington. Hillary is a beneficiary in their wills, insurance policies and other funds.
Hillary appears to be bonded equally well to both Bruce and Mark. She calls Bruce “Daddy” and Mark “Poppy.” Bruce cooks most of the meals, while Mark often reads the bedtime stories. They both take Hillary on outings. The Department of Human Services has recommended in favor of them joint petition.
The judge added:
[T]he only issue before the court is a legal one since factually this court is satisfied by all of the evidence that Mark D. is fit and suitable to raise Hillary, even alone, and that this court would conclude on a single petition by Mark D. that it would be in Hillary’s best interests to be adopted by him.
The judge then ruled, for reasons explained below, that the adoption statute did not permit Mark to join in Bruce’s adoption of Hillary. This appeal followed.
*842 II. SUMMARY OF DECISION
Before offering our analysis, we believe it will be helpful to provide the following summary of decision:
1. D.C.Code § 16-302 (1989 Repl.) expressly authorizes adoptions by “[a]ny person,” without limitation. It then imposes a restriction on adoption by a spouse of the natural parent (that parent must “consent”), as well as a restriction on adoption by every other married petitioner (the petitioner’s spouse must “join[ ] in the petition”). There is no mention of adoptions by unmarried couples. A later provision, D.C.Code § 16-305, refers generally to adoptions by “more than one petitioner,” and D.C.Code § 16-312(a) acknowledges the “adopting parent or parents.” Finally, D.C.Code § 49-202 (1990 Repl.), which antedates the adoption statute, provides that “[w]ords importing the singular ... shall be held to include the plural” unless that “construction would be unreasonable.” These provisions, taken together, neither assuredly authorize adoptions by unmarried couples nor conclusively preclude them. The court, therefore, must consider this ambiguous statutory language in light of other interpretive criteria.
2. The legislative histories of the 1954 (present) adoption statute and of its 1937 predecessor add little to our understanding of legislative intent except for a significant, unexplained omission: beginning with the 1937 statute, Congress withheld language found in the first (1895) District of Columbia adoption statute limiting adoptions by couples to “husband and wife.” After 1895, no committee report or comment from the House or Senate floor addressed “who may adopt.” And nothing in the legislative history can be said to exclude adoptions by unmarried couples.
3. Because the statutory language and legislative history of the 1954 statute do not indicate that Congress paid attention to unmarried couples, one way or another, the language in D.C.Code § 16-302 specifying restrictions that apply “if’ a petitioner has a “spouse” does not provide a basis for inferring that Congress consciously decided to exclude unmarried couples from eligibility to adopt. According to applicable case law, the expressio unius canon of construction (expression of one thing excludes another) only applies when the legislature is aware of the matter excluded.
4. In contrast, the doctrine of “strict construction” would limit adoptions to couples who are married, regardless of whether Congress thought about the matter, simply because the statute refers to married couples and no others. This court, however, has rejected strict construction of the adoption statute in favor of “liberal construction” in other adoption contexts. Moreover, courts in other states have employed liberal construction to allow adoptions by unmarried couples under statutes similar to the District of Columbia statute, in order to further the statute’s beneficial purposes. The trial court’s adherence to strict construction, therefore, is not easily justified.
5. The traditional interpretive criteria cautioning against statutory construction that leads to “absurd results” or “obvious injustice,” while marginally relevant (if relevant at all), cut in favor of a liberal construction that includes unmarried couples as eligible adopters.
6. Under the circumstances, where the statutory language, legislative history, and other applicable criteria are not dispositive, the controlling interpretive criterion, according to applicable case law, is the court’s obligation to effectuate the legislative purpose of the adoption statute. There is no proper way of discerning legislative intent based on how Congress in 1954 would have answered the question whether unmarried couples should be eligible to adopt. This court, therefore, must focus on the general purpose or policy that motivated Congress to pass the adoption statute. There is considerable case law emphasizing that the “paramount concern” of the adoption statute — its central beneficial purpose — is the “best interests of the prospective adoptee.” We conclude that this purpose is better served by applying a liberal, inclusionary reading of the statute to the facts presented here, for which there is persuasive decisional precedent; this case and others demonstrate that adoption by an unmarried couple can be in a child’s *843 best interests- — especially when the alternative would be a child’s living in a family with two unmarried parents, only one of whom would be allowed to establish a formal parental relationship.
7. As indicated earlier, the statutory rule of construction in D.C.Code § 49-202 would convert § 16-302 to say “any persons,” not merely “any person,” may petition for an adoption if that construction would not be “unreasonable.” Because we have concluded that liberal construction of the statute is appropriate here, and because this case and others show that adoptions by unmarried couples can be in the best interests of children, there is no basis for concluding that adoptions by unmarried couples would, categorically, be “unreasonable.” We therefore are satisfied that § 49-202 supports the analysis here and that § 16-302 should be construed accordingly.
8. We conclude, finally, that the so-called “stepparent exception” in D.C.Code § 16-312(a) would apply, under the circumstances, to prevent termination of the relationship between Hillary and her unmarried natural parent (Bruce by adoption) if his life partner (Mark) is allowed to adopt the child and live as a family with Bruce and Hillary.
9. The trial court's order is reversed and the case remanded for further proceedings to determine whether it will be in Hillary’s best interest for Mark, as well as Bruce, to adopt her.
III. Whether An Unmarried Couple Is Eligible to Adopt A Child
A. Preliminary Observation: How To Conceptualize This Case
As indicated in the statement of facts and proceedings, although Bruce and Mark were living together at the time Hillary joined them, Bruce alone petitioned for Hillary’s adoption, which the court granted. Later, in a partially redundant exercise, both Bruce and Mark petitioned to adopt Hillary, and Bruce, in addition, formally “consented” to Mark’s joining in the petition. As will become clear from our statutory analysis, this particular approach reflects an understandable effort to cover all the bases, so to speak, in advocating the eligibility of an unmarried couple to adopt a child in the District of Columbia. In reality, therefore, despite Bruce’s initial, separate adoption of Hillary, the parties seek a way for them jointly to adopt her, and that is how we conceptualize this case. For reasons that we shall explain more fully once the statutory framework and related issues become more focused, this case is not better interpreted, more narrowly, as a petition filed by a single, unmarried person, Mark, seeking to adopt Hillary while using Bruce’s “consent” to preserve Bruce’s preexisting parental rights.
The result should be the same whether members of an unmarried couple living together in a committed personal relationship seek to adopt sequentially or simultaneously. This, then, is the perspective from which we view — and decide — the case.
B. Applicable Statutory Provisions and the Trial Judge’s Ruling
Three provisions of the adoption statute are relevant to determining whether more than one person may lawfully adopt a child and, if so, whether an unmarried couple [2] is eligible. D.C.Code § 16-302 (1989 Repl.) (captioned “Persons who may adopt”) provides:
[1] Any person may petition the court for a decree of adoption. [2] A petition may not be considered by the court unless petitioner’s spouse, if he [or she] has one, joins in the petition, except that [3] if either the husband or wife is a natural parent of the prospective adoptee, the natural parent need not join in the petition with the adopting parent, but need only give his or her consent to the adoption. [4] If the marital status of the petitioner changes after the time of filing the petition and before the time the decree of adoption is final, the petition must be amended accordingly. [Emphasis added.]
*844 D.C.Code § 16-305 (captioned “Petition for adoption”) lists the categories of information a petitioner must supply and then concludes:
If more than one petitioner joins in a petition, the requirements of this section apply to each. [Emphasis added.]
Finally, D.C.Code § 16-312 (captioned “Legal effects of adoption”) provides in paragraph (a):
[1] A final decree of adoption establishes the relationship of natural parent and natural child between adopter and adoptee for all purposes, including mutual rights of inheritance and succession as if adoptee were born to adopter. The adoptee takes from, through, and as a representative of his [or her] adoptive parent or parents in the same manner as a child by birth, and upon the death of an adoptee intestate, his [or her] property shall pass and be distributed in the same manner as if the adoptee had been born to the adopting parent or parents in lawful wedlock. [2A] All rights and duties including those of inheritance and succession between the adoptee, his [or her] natural parents, then’ issue, collateral relatives, and so forth, are cut off, [2B] except that when one of the natural parents is the spouse of the adopter, the rights and relations as between adoptee, that natural parent, and his [or her] parents and collateral relatives, including mutual rights of inheritance and succession, are in no wise altered. [Emphasis added.]
The first question — whether it is legally possible for an unmanned couple, see supra note 2, to adopt a child — focuses our attention, initially, on § 16-302, which governs who may adopt. The trial judge interpreted this provision to exclude the possibility of adoption by an unmanned couple because (in the judge’s words) the institution of adoption as a creation of statute, not of common law, “must be strictly construed,” and there is no discernable legislative intent “to extend the right and privilege of adoption to more than one unmarried person at a time.”[3] In other words, reasoned the judge, because there is no basis for inferring that Congress affirmatively intended to permit a child’s adoption by more than one unmarried adult — i.e., because, according to the judge, there is an “absence of specific legislative intent” — the court must conclude that Congress rejected the possibility and thus has not authorized it.
There is an unconvincing leap of reasoning here. An “absence of specific legislative intent” does not always mean the legislature thought about something and rejected it; the omission also can mean the legislature did not think about the idea at all, and thus took no position on it.
It is unclear whether the trial judge considered this latter possibility, but it appears from her analysis that she believed it is irrelevant whether Congress thought about adoptions by unmarried couples. She seemed to be saying, rather, that the controlling fact is what the statute says; it does not expressly provide for such adoptions; end of case.
The trial judge reached her result by making a decision to employ “strict construction,” meaning, to “apply the law as it is written, without undue extension by interpretation.” Brown v. United States, 66 A.2d 491, 493 (D.C.1949). According to strict construction doctrine, “[t]he courts have consistently held legislation derogative of the common law accountable to an exactness of expression and have not allowed the effects of such legislation to be extended beyond the necessary and unavoidable meaning of its terms.” Scharfeld v. Richardson, 76 U.S.App.D.C. 378, 379, 133 F.2d 340, 341 (1942).
The judge, however, just as easily could have opted for a “liberal interpretation,” meaning “[t]he statutory provisions, where ambiguous, are to be construed liberally to effectuate the beneficial purposes that Congress had in mind.” United States v. Zazove, 334 U.S. 602, 610, 68 S.Ct. 1284, 1288, 92 L.Ed. 1601 (1948). This court itself has emphasized that “the rule that statutes in *845 derogation of the common law are to be strictly construed does not require such adherence to the letter as would defeat an obvious legislative purpose or lessen the scope plainly intended to be given to the meaning.” District of Columbia v. Thompson, 593 A.2d 621, 632 (D.C.1991) (citation omitted). The Supreme Court, moreover, has made the point even more emphatically: “The canon in favor of strict construction is not an inexorable command to override common sense and evident statutory purpose .... [T]he canon does not require distortion or nullification of the evident meaning and purpose of the legislation.” United States v. Brown, 333 U.S. 18, 25-26, 68 S.Ct. 376, 380, 92 L.Ed. 442 (1948) (citation and internal quotation marks omitted). With particular reference to adoption statutes, many courts have shown a preference for liberal over strict construction, as the cases collected below in the margin reveal.[4]
The point here is not to say, summarily, that the trial judge’s approach is wrong; rather, we merely point out that another, respectable approach is available and that a more in-depth look at the statute is required than mere election between conflicting general rules of construction.
C. Rules For Statutory Interpretation.
This court, in Peoples Drug Stores v. District of Columbia, 470 A.2d 751 (D.C.1983) (en banc), has prescribed a comprehensive approach to statutory interpretation. Initially, the court must “look at the language of the statute by itself to see if the language is plain and admits of no more than one meaning,” since the “primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he [or she] has used.” Id. at 753 (citations and internal quotation marks omitted). We added, however, that this “plain language” or “plain meaning” rule is the first, but “not always the last or the most illuminating step” in statutory analysis. Id. at 754. We then outlined situations in which courts properly “look beyond the plain meaning of statutory language.” Id.:
First, even where the words of a statute have a superficial clarity, a review of the legislative history or an in-depth consideration of alternative constructions that could be ascribed to statutory language may reveal ambiguities that the court must resolve
[[Image here]]
Second, the literal meaning of a statute will not be followed when it produces absurd results....
Third, whenever possible, the words of a statute ai’e to be construed to avoid obvious injustice.
*846 Finally, a court may refuse to adhere strictly to the plain wording of a statute in order to effectuate the legislative purpose, ... as determined by a reading of the legislative history or by an examination of the statute as a whole....
Id. (citations and internal quotation marks omitted). We concluded by warning that these four exceptions to the plain meaning rule should not be understood “to swallow the rule completely,” since there are strong policy reasons why everyone should be able to rely on what the statutory language, as commonly understood, appears to say. Id. at 755. Accordingly, we said, “a court should look beyond the ordinary meaning of the words of a statute only where there are persuasive reasons for doing so.” Id. (citations and internal quotation marks omitted).
D. Adoptions By Unmarried Couples: Language of the Adoption Statute, and the Statutory Ride of Constmetion in D.C.Code § 49-202
 We turn to the statutory language at issue, quoted above in Part III. B. Without doubt, under the adoption statute more than one person may lawfully adopt a child. Although the first sentence of D.C.Code § 16-302 is expressed in the singular — “Any person may petition the court for a decree of adoption” — the balance of that section acknowledges adoption by spouses who “join[ ] in the petition.” Furthermore, D.C.Code § 16-305, which specifies the information required in an adoption petition, refers at the end to “more than one petitioner” who join in a petition. Finally, D.C.Code § 16-312(a), which prescribes the legal effects of adoption, refers to the “adopting parent or parents” (as well as to a special rule that applies “when one of the natural parents is the spouse of the adopter”). Thus, the question is not whether, in the abstract, more than one person may adopt a child but rather, more concretely, whether in all instances when two persons seek to adopt they must be married to each other.[5]
The adoption statute is unclear. D.C.Code § 16-302 expressly allows “[a]ny person” of any status, not just a married person, to petition for adoption. Moreover, § 16-305 acknowledges adoptions by “more than one petitioner,” not merely by two “spouses” or by a “husband and wife.” This neutral language in §§ 16-302 and -305, therefore, arguably leaves room for joint petitions by unmarried couples. But there is a hitch; various references in § 16-302 to “spouse,” “husband,” “wife,” and marital status muddy the picture. The question is, do the § 16-302 provisions requiring a “petitioner’s spouse, if he [or she] has one,” to “join[ ] in the petition,” except when “the husband or wife is a natural parent of the prospective adoptee,” imply that only couples who are married may adopt children?
Before we try to answer that question, we note that another statute becomes relevant here. A prescribed “statutory rule[ ] of construction,” D.C.Code § 49-202 (1990 Repl.), provides:
Words importing the singular number shall be held to include the plural, and vice versa, except where such construction would be unreasonable.
This statute was enacted in 1901[6] and thus automatically became a “legislatively mandated rule of ... construction” [7] of the adoption statute we construe here, enacted over half a century later in 1954.[8] If its application to the adoption statute would not be “unreasonable,” § 49-202 would appear to *847 clinch the argument that § 16-302 authorizes adoptions by unmarried couples, because this authorizing provision would then read: “Any persons may petition the court for a decree of adoption” — an unequivocal statement of eligibility unfettered by subsequent language in § 16-302 specifying what happens when a married person seeks to adopt. Without further analysis, however, we cannot say that § 49-202 is conclusive; it will not turn singular into plural, expressly authorizing adoption by two unmarried persons, if that “construction would be unreasonable.” Id.
This reasonableness requirement is a categorical, not a case-by-case, limitation that effectively turns the analysis back to interpretation of the adoption statute itself. With that said, however, the overall structure of § 49-202 — a general rule subject to an exception — suggests that the rule presumptively applies. This means that the burden falls on those who would strictly construe the adoption statute to demonstrate persuasively why it “would be unreasonable,” id., for a court to hold that unmarried couples are eligible to adopt under § 16-302.[9]
We therefore begin the “reasonableness” analysis by returning to the language of the adoption statute. As we have indicated, the principal obstacle to expansive interpretation of § 16-302 is found in the language of that section that specifically refers to “spouse,” to “husband and wife,” and to “marital status.” See supra Part III. B. More specifically, § 16-302 identifies three adoption categories: adoption by “[a]ny person,” who need not be married; adoption by one spouse when the other spouse is the natural parent (in which case the natural parent must merely “consent to the adoption”), and adoption by a married couple, neither of whom is the child’s natural parent, and thus both of whom must “join[ ] in the petition.” For several reasons, however, the fact that § 16-302 expressly recognizes three categories of adoptions does not conclusively answer whether these are the only permissible kinds of adoptions.
In the first place — and of considerable significance- — Congress unquestionably knew how to limit adoptions by two persons to married couples, as it expressly did in the 1895 adoption statute (“a person or a husband and wife” may adopt).[10] But Congress chose not to do so.[11]
Second, by using a series of “ifs” (“if’ the petitioner has a spouse; “if’ either spouse is a natural parent; “if’ the marital status changes), Congress formulated § 16-302 in a way that leaves room for inferring that the two identified types of adoptions involving *848 couples are particular examples, requiring special rules; they are not necessarily exclusive descriptions limiting adoptions to couples who are married. This lack of implied exclusiveness is evident from the fact that there are sound reasons why the partner of an unmarried adoption petitioner, while permitted to join in the petition, should not necessarily be required to do so. A legislature, for example, might prefer to leave the trial court with discretion to make an ad hoc determination of the solidity of an unmarried relationship sufficient for a joint adoption, rather than trying to spell out such criteria in adoption legislation. We do not say that Congress took that approach here; we say only that, by specifying joint participation requirements for married couples, Congress did not necessarily imply that it was addressing the only situation in which couples were eligible to adopt, since the rules applicable to married couples would not necessarily be right for all adopting couples when one member seeks to adopt a child.
Third, the term “adoption” itself implies no self-evident limitation on who may adopt. Recently we noted that a “marriage,” according to “the ordinary sense and meaning traditionally attributed to the word,” does not include a same-sex couple, and thus partly for this reason we concluded that Congress, in enacting the marriage statute without specific limitation to heterosexual couples, could not have intended to include same-sex couples. See Dean v. District of Columbia, 653 A.2d 307, 315 (D.C.1995) (citations omitted). In contrast, the idea of “adoption” does not suggest an inherent, traditional limitation on who may adopt; we cannot use an “ordinary” meaning of “adoption” to say that Congress assuredly made unmarried couples ineligible to adopt. See Adoption of Tammy, 416 Mass. 205, 619 N.E.2d 315, 319 n. 4 (1993).[12] Indeed, theoretically, an adult child is eligible under the statute to adopt a parent, or a brother his sister, subject of course to a court’s rejection of the proposal on the facts presented. The point is, courts over the years have entertained all sorts of adoption petitions to create “non-standard” families, granting some and denying others in the prospective adoptee’s best interests. See supra note 12.
Finally, whether Congress intended to limit adoptions by couples to those who are married, or did not give any thought to the matter, the fact is that the level of generality of the language used in the present adoption statute, in contrast with the 1895 statute— even without regard to the dictates of D.C.Code § 49-202 converting singular words to the plural unless “unreasonable”— leaves plenty of room under D.C.Code § 16-302 for extending adopter eligibility to unmarried couples. The Supreme Court has emphasized that, “[w]hile a statute speaks from its enactment, [it] embraces everything which subsequently falls within its scope.” Browder v. United States, 312 U.S. 335, 339-40, 61 S.Ct. 599, 602, 85 L.Ed. 862 (1941). And this court has said in a similar vein: “The object of a statute may be so general and its language so broad as to reach conditions fairly coming within its intent and sweep although such conditions did not come into existence until years after its enactment.” Rosenberg v. United States, 297 A.2d 763, 765 (D.C.1972). We do not say that the *849 statutory language definitely permits adoption by unmarried couples; we say that the statute, by virtue of its multiple uses of neutral, general language, can comfortably be read to embrace such adoptions.[13]
At this point in the analysis, therefore, we are not able to say either that the adoption statute “plainly,” i.e., conclusively, allows adoption by an unmarried couple or that the statute “plainly” limits joint adoption to a “husband and wife” (as the 1895 statute did). The language gaps and generalities create too much ambiguity to require either interpretation.
Any inference that marriage is required before a couple may adopt, based solely on the language in § 16-302 referring to marital status, is a weak inference at best. Indeed, our analysis thus far has revealed an “alternative construction[ ]” ascribable to the statutory language, Peoples Drug Stores, 470 A.2d at 754 — namely, an interpretation derived from the statute’s neutral, inclusive language applied in the context of a “paramount concern” for the “best interests of the child” — which suggests just as reasonable an inference that adoptions by unmarried couples are not automatically precluded. Accordingly, the trial court’s statutory interpretation that bars the adoption here is based, at best, on “superficial clarity.” Id. Pursuant to the first exception to the “plain meaning” rule, therefore, we must address the statutory “ambiguities,” id., by consulting legislative history. See supra Part III. C.
E. Adoptions By Unmarried Couples: Legislative History
Before 1895, when Congress enacted its first adoption statute,[14] adoptions were unavailable in the District of Columbia because adoption was not possible at common law.[15] The 1895 Act is interesting in that, as originally proposed, the bill simply authorized a petition for adoption by “a person.”[16] It was amended on the House floor to permit adoption by “a person or a husband and wife,” in order to remove any doubt as to whether both could join in the petition.[17]
Congress repealed the 1895 Act and adopted the first comprehensive adoption statute for the District in 1937.[18] The new statute contained no provision specifying who was entitled to adopt, although it required the petition to state “whether the petitioner is married or single” and precluded consideration of a petition “unless petitioner’s spouse join[ed] in the petition or consented] to the adoption.”[19] No longer, therefore, were petitioners expressly limited to “a person or a husband and wife.” The 1937 Act also provided that a final adoption decree would “establish the relation of natural parent and natural child” for all purposes, provided that an adopted child could not inherit from the parents or collateral relatives of the child’s adoptive parents.[20] The statute, however, added an exception to that limitation: in the event that one of the natural parents was “the spouse of petitioner,” the adoptee would retain the rights of inheritance and succession from that parent, as well as from related grandparents and collateral relatives.[21]
Aside from “minor exceptions” the adop *850 tion statute was not amended until 1954,[22] when Congress repealed the 1937 Act with a comprehensive statutory revision.[23] As to the kinds of requirements at issue in this ease, there were four noteworthy changes. First, the 1954 statute reinstituted a provision on “persons who may adopt” (now D.C.Code § 16-302), but, in contrast with enactment of the 1895 statute, Congress used language that is completely neutral: “Any person may petition the court for a decree of adoption” (emphasis added). Second, the 1954 statute more directly stated (now in D.C.Code § 16-302) that a natural parent married to the petitioner need only consent to, rather than join in, the adoption. Third, in the provision (now D.C.Code § 16-305) that prescribed the requirements for an adoption petition, Congress added another neutral sentence, not found in the 1895 and 1937 statutes, expressly recognizing petitions filed by “more than one petitioner” — a retreat even further than in 1937 from the 1895 terminology, “husband and wife.” Fourth, the provision governing inheritance rights (now D.C.Code § 16-312) was changed. Under the 1954 Act, the adopted child now inherits from grandparents and collateral relatives as though he or she were a “child by birth” of the adoptive parents. See D.C.Code § 16 — 312(a). The 1954 Act also confirms that, upon adoption, all rights of inheritance and succession between the child and the natural parents are cut off, except when one of the natural parents is the spouse of the adopting parent. Id.
It is important to add that only in connection with the 1895 Act did any member of Congress speak on the record about the scope of the provision governing who is entitled to adopt. Nowhere in any committee report, from either House of Congress, nor in any speech on the House or Senate floor, was there any discussion in 1937 or in 1954 about who is entitled to adopt; the statutory language is left to speak for itself.[24] With that said, however, it is important to reemphasize that in 1895 the statute referred to “a person or a husband and wife” joining in an adoption, whereas in 1954 the statute was drafted to refer neutrally, in § 16-302, to a petition by “[a]ny person,” and, in § 16-305, to a petition by “more than one petitioner.” These substantial language differences between the 1895 and 1954 approaches (separated in time by much less specific language, either way, in the 1937 statute) are significant; they show that Congress can speak precisely about who, as a couple, can adopt, and that Congress chose not to do so in the present statute. See supra notes 11 and 13. What was once plain language no longer is, and thus the indications are that Congress, by selecting neutral language to describe adoption petitioners in general, has now left room — wittingly[25] or unwittingly[26] — for an unmarried couple, as well as for a “husband and wife,” to join in an adoption.[27]
This shift away from the 1895 “husband and wife” approach is all the more important in light of D.C.Code § 49-202, in effect since 1901, which provides that “[w]ords importing the singular number shall be held to include *851 the plural” unless “unreasonable.” As indicated earlier, absent an express limitation in § 16-302 to adoptions by couples who are married, § 49-202 presumptively applies, converting § 16-302 to say that “any persons ” shall be eligible to adopt except when categorically “unreasonable.” The legislative history in no way suggests that application of this interpretative presumption here would be “unreasonable.”
In sum, the legislative history of the 1954 Act itself adds very little to our understanding, derived from the language of §§ 16-302, -305, and -312, as to whether an unmarried couple is entitled to adopt. From the perspective of statutory evolution, however, we can see that the legislative history of adoption statutes in this jurisdiction, when coupled with the substantive gloss of § 49-202, points toward inclusive application of the statute to unmarried couples. Because, however, the statutory language and the legislative history (as it pertains to specific provisions of the 1954 Act) are inconclusive, we must consider still other interpretive criteria.
F. Adoptions By Unmarried Couples: Canons of Statutory Construction, and “Strict” v. “Liberal” Construction
Courts scrutinize statutory language and legislative history with a view to finding out what the legislature actually intended at the time of enactment. Courts also sometimes use canons of statutory construction for that purpose. Aside from her reference to the general principle of “strict construction,” the trial judge did not employ canons of construction. Because the District of Columbia has joined the appellants’ side on appeal, however, we believe it is important to assess, sua sponte, the merits of a particular canon of construction that the proponents of the trial court’s ruling undoubtedly would cite.
1. Expressio Unius
One way of looking at the trial judge’s analysis would be to say she focused exclusively on the language in § 16-302 that contemplates adoption by a married couple (“spouse,” “husband and wife,” “marital status”), and then applied, implicitly, the Latin maxim expressio unius est exclusio alterius: “when a legislature makes express mention of one thing, the exclusion of others is implied.” McCray v. McGee, 504 A.2d 1128, 1130 (D.C.1986) (statute permitting exception for counterclaims to Small Claims Branch jurisdictional limit understood to preclude exception for unmentioned cross-claims).[28] It is important to recognize, however, that reliance on any particular canon of statutory construction cannot be conclusive; indeed, “for every canon, one can find an applicable countercanon.” In re Kossow, 393 A.2d 97, 101 (D.C.1978) (citation omitted). In this case, for instance, since Congress did not expressly exclude adoptions by unmarried couples, the trial judge just as easily might have relied on the canon that says; statutory language may fairly be understood to comprehend many different cases when only some are expressly mentioned by way of example.[29]
*852 It is important to understand that canons of construction are not rules of substantive law, see Neuberger v. Commissioner of Internal Revenue, 311 U.S. 83, 88, 61 S.Ct. 97, 101, 85 L.Ed. 58 (1940); Matter of Chicago, Milwaukee, St. Paul & Pacific R.R. Co., 658 F.2d 1149, 1158 (7th Cir. 1981)—unless enacted as such, as was D.C.Code § 49-202. See supra note 6 and accompanying text. Nor is any particular canon easily identifiable as a tool of interpretation that assuredly applies to a particular statute. Karl Llewellyn once supplied a list of 28 instances where a proffered canon of construction could be neutralized effectively by another one.[30] In reality, therefore, when a court relies on a particular interpretive maxim such as expressio unius, the court is commonly electing between conflicting shorthand expressions to describe, after the fact, the court’s particular rationale for deciding, for an assortment of reasons, what the statute means, having taken into account the statutory language and legislative history, the legislative scheme as a whole (including statutes that should be read together), and statutory purpose. Application of a canon of statutory construction, therefore, is actually a way of summarizing — of explaining — -a decision otherwise made; it is not really a way of reaching a decision.[31]
The question, then, is whether ex-pressio unius describes a valid approach to discerning whether Congress in 1954 intended to include unmarried couples among the persons eligible to adopt children. The assumption underlying expressio unius is that, by reference to what the legislature said, the court can tell that the legislature thought about another matter and rejected it. In other words, this canon is shorthand for saying that the legislature said enough to imply it was covering the field, and thus that any omission within that field had to be intentional, not inadvertent. See McCray, 504 A.2d at 1130 (“Congress, by failing to mention cross-claims in section 16-3904, must be presumed to have consciously excluded cross-claims from that section.”) (emphasis added).
This kind of reasoning has been applied in several common situations: when the statute specifies remedies,[32] itemizes exemptions[33] or deductions,[34] or creates exceptions[35]— classic examples of legislative action that, by its very nature, purports to be exclusive and thus clearly suggests the legislature has thought about the particular matter omitted.
For three reasons the adoption statute does not present such a situation. First, in considering whether married couples are excluded as adopters, we are not dealing with typical expressio unius categories: specified remedies, exemptions, exceptions. Second, the statutory language itself does not clearly purport to specify all eligible adopters, given its level of generality (especially when compared with the 1895 statute) and its use of “ifs” when referring to married couples.
Finally, and of considerable importance, there is no basis here for inferring that Congress even considered adoption by unmarried *853 couples, let alone took a position on it. Both the statute and legislative history are silent on the subject. Nor is this a case where the legislature, in considering who should be allowed to adopt, necessarily would have considered unmarried couples. It might have done so, but did not assuredly do so. For that reason the very premise of expressio unius — that the legislature considered and rejected a proposed possibility, see McCray, 504 A.2d at 1130 — is missing. See Adoption of Tammy, 619 N.E.2d at 319 (“While the Legislature may not have envisioned adoption by same-sex partners, there is no indication that it attempted to define all possible categories of persons leading to adoptions in the best interests of children.”) (footnote omitted).
We therefore must conclude that the ex-pressio unius rationale cannot be used to explain the omission of unmarried couple adopters from § 16-302, and thus it cannot be applied to justify the exclusion of unmarried couples from eligibility to adopt.
2. Strict Construction
The “strict construction” approach which the trial judge applied is akin to expressio unius analysis in that it would preclude extension of the statute beyond expressly permitted situations. See supra III. B. But there is a fundamental difference: instead of saying that expression of one thing should be understood as the conscious exclusion of another, strict construction says, the other way around, that legislative failure to express a possibility — including failure to erase a common law or other established norm — should be understood by itself to exclude that possibility.[36]
In this case, strict construction would deny adoptions to unmarried couples simply because adoption as such was impossible at common law and, solely for that reason, should be precluded unless the statute expressly recognizes a particular adoptive relationship. See Scharfeld, 76 U.S.App.D.C. at 379, 133 F.2d at 341. The fact that adoptions have been authorized in the District of Columbia since 1895, see supra note 10, suggests that this particular rationale for strict construction of the 1954 statute is no longer persuasive. But more to the point, as we have noted, many jurisdictions have come to reject strict construction of adoption statutes in recognition of an overriding need to effectuate their beneficial purposes. See supra note 4. This court, at least implicitly, has joined this trend.
In In re J.H., 313 A.2d 874 (D.C.1974), in sustaining an adoption (with the mother’s consent) by the admitted father of an illegitimate child, we took an inclusive approach based both on the statute’s general language permitting “any person” to adopt and on the statute’s “paramount concern,” namely, “the best interests of the child.” Id. at 875-76. Rejecting the idea that particular kinds of adoptions are precluded if not expressly recognized, we stressed: “It is noteworthy that Section 16-302 does not exclude the father of an illegitimate child from the class permitted to adopt.” Id. at 875 (emphasis added).[37] In *854 this jurisdiction, therefore, as in Massachusetts, see Adoption of Tammy, supra note 12, we have recognized that a “non-standard,” id., family created under the adoption statute can be in a child’s best interest. While not directly on point, J.H. at least makes clear that this court has favored a liberal over a strict construction of the adoption statute.
We therefore conclude that the strict construction approach, like the expressio unius maxim, does not offer a persuasive reason for precluding adoptions by unmarried couples. Premising statutory interpretation on a pre-1895 state of affairs, without attention to more recent legislative principles, hai’dly commends itself — at least not to this court. As yet, therefore, we have seen no basis for concluding that it “would be unreasonable” to interpret § 16-302 in light of § 49-202, as applied to unmarried couples, to say: “Any persons may petition the court for a decree of adoption.” (emphasis added).
We turn to still other interpretive criteria.
G. Adoption By Unmamed Couples: Other Interpretative Criteria — “Absurd Results” and “Obvious Injustice”
Without a record that goes beyond this particular case we are not prepared to say, categorically, either that a legislative limitation of adoption to married couples and single persons or that a statutory embrace of unmarried couples (whether opposite-sex or same-sex) would lead to “absurd results” or to “obvious injustice.” Peoples Drug Stores, 470 A.2d at 754. If a suitable single person or married couple were available to adopt every child who lacked a permanent home, then in light of a legislature’s prerogative to provide for the best interests of children, we would be hard pressed to say that a statutory limitation of eligible adopters to single persons and married couples would be so “absurd” or “unjust” for children that the court should exercise its power, through statutory interpretation, to extend eligibility to unmarried couples. But if children available for adoption are likely to be denied permanent, loving homes when unmarried couples are refused the opportunity to adopt (or decline the opportunity for one member of the couple alone to adopt), we would have to say the “absurdity” and “injustice” criteria cut very much against a restrictive interpretation of the adoption statute, given judicial decisions concluding that such adoptions would be in the child’s best interests. Because, however, we have no empirical basis of record for evaluating the general impact of the adoption statute as interpreted one way or another in the District of Columbia, we cannot effectively use the “absurdity” and “injustice” criteria as interpretive tools for across-the-board statutory interpretation.
With this said, however, it is important to recognize the trial judge has indicated that, but for the perceived statutory prohibition of adoptions by unmarried couples, the adoption Bruce and Mark are now seeking would be in the child’s best interests (more later). Moreover, in three other eases (which have not been appealed), Superior Court judges have granted adoptions to unmarried, same-sex couples on the basis of each child’s best interest. Matter of the Adoption of D.S. and R.M. for the Adoption of a Minor Child, 123 Daily Wash.L.Rptr. 1149 (D.C.Super.Ct. June 14, 1995); In re W.S.D., Adoption Case No. A-308-90 (D.C.Super.Ct. April 29, 1992); Matter of Petition of L.S. and V.L. for the Adoption of Minor (T.) and Minor (M.), 119 Daily Wash.L.Rptr. 2249 (D.C.Super.Ct. Oct. 21, 1991).
All these developments indicate to us that, in the context of considering whether unmai’-ried couples are eligible to adopt, a court construing an ambiguous statute would find it difficult to conclude on the basis of “absurdity” or “injustice” that the adoption statute categorically excludes such adoptions.
H. Adoption By Unmamed Couples: A Final Iutei'pretive Criterion — “Legislative Purpose”
We turn to the final interpretive criterion that applies when the statutory language lacks plain meaning: a judicial obligation “to effectuate the legislative purpose” by reference to “the legislative history” and the “statute as a whole.” Peoples Drug Stores, 470 A.2d at 754 (citations and internal quota *855 tion marks omitted).[38] Is § 16-302 better interpreted inclusively, to permit adoption by unmarried couples if in the child’s best interests, or more appropriately construed exclusively, to limit adoptions to married couples assuredly covered by express statutory language?
In Peoples Drug Stores, 470 A.2d at 754-55 n. 4, we briefly noted two common approaches to ascertaining legislative purpose: (1) “an essentially historical inquiry to determine how the enacting legislature would have answered the specific question” the court is facing (“legislative intent” model), and (2) an “attempt to discern the general purpose or policy that motivated the legislature to pass a statute,” followed by an effort to “construe the statute in the manner most consistent with that purpose” (“purposive interpretation” model). We add two further observations: the less plain the statutory language is, the more likely the focus on legislative intent or statutory purpose will be determinative; and the less clear the answer is to the historical inquiry about how the legislature would have answered the unconsidered question, the more likely an analysis based on general statutory purpose will be conclusive.
1. Legislative Intent
Under the “legislative intent” model we would try to ascertain how the enacting legislature, Congress, would have answered the question — “Shall unmarried couples be eligible to adopt?” — when it passed the statute in 1954. See id. at 754. We do not hesitate to say that pursuit of that answer would be entirely speculative and thus futile. We have no basis for taking judicial notice of the mores and predilections of the 83d Congress in this area of the law.[39] Furthermore, given the fact that Congress expressly recognized in § 16-302 the opportunity for “[a]ny person,” including any unmarried person, to *856 adopt a child — -and also given the fact that Congress abandoned its 1895 approach that expressly limited adopters to “a person or a husband and wife,” see supra note 10 — we cannot infer an unambiguous intent from the language itself that would preclude unmarried couples from petitioning for adoptions. Finally, we have already noted that the term “adoption” suggests no inherent limitations on who may adopt and thus supplies no self-evident meaning underlying legislative intent. Accordingly, the “legislative intent” model is unhelpful; we must refer instead to so-called “purposive interpretation.” Peoples Drug Stores, 470 A.2d at 754.
2. Statutory Purpose
Under the “statutory purpose” approach, as indicated earlier, we “will attempt to discern the general purpose or policy” that motivated Congress to enact the 1954 adoption statute and then will “construe the statute in the manner most consistent with that purpose.” Id. at 755 n. 4.
Adoption statutes were first enacted in this country in the middle of the nineteenth century. See 2 C.J.S. Adoption § 2 (1972). Early adoption legislation authorized transfer of children by deed from one set of parents to another, without legal proceedings. See Homer H. Clark, Jr., Law of Domestic Relations § 18.1, at 603 (1968). “More modern statutes, generally taken to date from the passage of the Massachusetts statute in 1851, provide for the institution of a legal proceeding leading to a decree of adoption, thereby giving the courts some powers in the supervision of the adoption process.” Id. The statutory policy underlying all adoption statutes is to “promot[e] the best interests of children while at the same time protecting as far as possible the interests of both natural and adoptive parents.” Id. § 18.3, at 614.
District of Columbia law reflects this development. Almost 50 years ago in In re Adoption of a Minor, 81 U.S.App.D.C. 138, 155 F.2d 870 (1946), the United States Court of Appeals for the District of Columbia Circuit noted that the “major premise” underlying the adoption statute is “the unity of the natural family.” Id. at 141, 155 F.2d at 873. The court then emphasized that, “[p]roceeding from that general premise, the statute carves out a process which will operate when the natural relationship goes awry.” Id. at 142, 155 F.2d at 874. Specifically, “[tjhis process of adoption is for the protection of the child” when, for example, the natural parents repudiate or fail to admit their responsibilities. Id.
The adoption statute at the time recognized, as it does now, that the court is to consider not only “the interests of the adop-tee” but also those of “the natural parents, the petitioner [for adoption], and any other properly interested party.” Id. at 141, 155 F.2d at 873 (internal quotation marks omitted); see D.C.Code § 16-301(a). But, as the federal circuit court had recognized even earlier, the paramount interest is that of the child. See In re Adoption of a Minor, 79 U.S.App.D.C. 191, 195, 144 F.2d 644, 648 (1944) (in balancing “conflicting considerations of public policy and private interest” Congress decided “the interests of the infant were of even greater importance” than those of the natural mother).
This “best interests” priority is traceable to ease law deciding child custody in event of divorce, see Wells v. Wells, 11 App.D.C. 392, 395 (1897), death of a parent, see Beall v. Bibb, 19 App.D.C. 311, 313 (1902), and neglect, see Holtsclaw v. Mercer, 79 U.SApp.D.C. 252, 145 F.2d 388 (1944). The requirement that an adoption must be “for the best interests” of the adoptee was incorporated into the adoption statute, for the first time, under the 1937 Act. See supra note 18. Although neither that statute nor the 1954 Act now in effect expressly calls the child’s best interests the paramount concern, the courts consistently have acknowledged that is so. See In re L.L., 653 A.2d 873, 880 (D.C.1995) (“[i]n adoption cases ... the decisive consideration is the best interests of the child”) (citation omitted); Matter of L.W., 613 A.2d 350, 355 (D.C.1992) (same); Petition of Douglas, 390 A.2d 1, 3 (D.C.1978) (“primary concern”); In re J.H., 313 A.2d at 874-76 (“paramount concern”); In re Adoption of a Female Infant, 237 A.2d 468, 469 (D.C.1968) (“primary concern”); Bell v. *857 Leonard, 102 U.S.App.D.C. 179, 183, 251 F.2d 890, 894 (1958) (“primary inquiry”).[40]
The adoption statute, therefore, is intended to provide a loving, nurturing home that pursues the best interests of the adopted child[41] after (1) transferring to the adoptive parent all legal rights, duties, and consequences of the parental relationship, (2) severing the rights and obligations of any natural parent who no longer will have custody of the child, and (3) determining all other legal effects of the adoption upon the families of the natural parents and the adoptive parents. See D.C.Code § 16-312.
It is entirely possible that every legislator who voted on the adoption statute would answer, if asked, that Congress only intended for married couples to adopt children. But the fact is, Congress did not say so. Indeed, as we have often repeated, Congress as early as 1937 scuttled the “husband and wife” language it began with in 1895. As we also have seen, when there is no clear language either of inclusion or of exclusion, courts liberally construing adoption statutes do not automatically reject a proposed application of the statute merely because that particular possibility was not expressly provided for; rather, as we stressed in In re J.H., especially in the adoption context courts commonly ask whether, in light of the language used and the statutory purpose, the proposed application is available and should be approved in the child’s best interests. See Adoption of Tammy, 619 N.E.2d at 319 (while legislature “may not have envisioned adoption by same-sex partners, there is no indication that it attempted to define all possible categories of persons leading to adoptions in the best interests of children”; thus, “[t]o the extent any ambiguity or vagueness exists in the statute, judicial construction should enhance, rather than defeat, its purpose” to advance “the best interests of the subject child.”); Adoption of B.L.V.B., 160 Vt. 368, 628 A.2d 1271, 1274 (1993) (“Because adoptions by same-sex partners were apparently not contemplated when § 448 was adopted, it cannot be said that they are either specifically prohibited or specifically allowed by the statute”; thus, the court must “determine whether such adoptions are consistent with the purpose of the statute”).
The decisive question, then, is whether adoptions by unmarried couples are likely enough to be in the best interests of children that we can say the statutory authority for such adoptions will further the statute’s purposes. We turn to that inquiry.
I. Adoption By Unmarried Couples: Furthering The Statutory Purpose By Achieving The Child’s Best Interests
The trial judge ruled in an earlier proceeding that Bruce’s adoption of Hillary was in the child’s best interest. In this case, the judge found that Hillary’s adoption by Mark, “even alone,” would also be in her best interest. Thus, the judge strongly intimated that Hillary’s joint adoption by Bruce and Mark, if legally permissible, would be in Hillary’s best interest, since the judge was aware that Hillary has been living with Bruce and Mark together from the time Hillary’s mother placed her with them both.
Given what the trial judge has said based on a substantial factual record, and further given the importance of determining whether interpretation of § 16-302 to permit adoptions by unmarried couples can promote the best interests of children, we use the facts of this case to evaluate the kinds of benefits that can flow from a liberal, inclusive interpretation of the adoption statute.[42]
*858 The proposed adoption by Mark very well may be in Hillary’s best interests because it would formalize a parental relationship that she recognizes in fact, and it would assure that both men are equally committed to her. Although both Mark and Bruce currently provide support for Hillary, Mark’s joining Bruce in the adoption would guarantee that they both continue to have an ongoing financial responsibility to her.[43] Furthermore, in the event that Mark and Bruce were to separate, Hillary would be assured of legal access to, and support from, both of them.[44]
As Hillary’s parent, Mark, like Bruce, would be able to obtain health insurance and other employment-related benefits for her.[45] In addition, Mark, like Bruce, would be allowed to act in Hillary’s best interest without challenge to his parental authority by third parties such as doctors, hospitals, day care programs, schools, and camps.[46]
Hillary would be protected in the event Mark died without a will because she would be entitled to inherit from him under the laws of intestate succession. See D.C.Code §§ 16-312, 19-301 et seq. Hillary also would have the right to inherit from Mark’s relatives, see id., and she would be eligible for other benefits, such as worker’s compensation payments and Social Security benefits upon Mark’s unemployment, disability, or death. See id. §§ 36-301(4), -308(4), -309, 46-101(19). Hillary, moreover, would have standing to bring a wrongful death action if Mark were accidentally killed, id. § 16-2701, and she could benefit from various statutes and regulations that provide certain rights and privileges for “next of kin” with respect to Mark (in addition to Bruce).[47] Additionally, Mark would have rights relating to Hillary which could inure to her best interests.[48]
*859 The adoption also would protect Hillary in the event of Bruce’s death, because Mark would be entitled to presumptive guardianship of Hillary and thus the family unit would not be threatened. If Mark were not Hillary’s legal parent in the event Bruce were to die, Mark would have to file an action for custody, guardianship, or adoption to preserve his relationship with Hillary. If contested, this process could be lengthy and costly and could culminate not merely in denial of Mark’s petition but, more significantly, in Hillary’s losing, in effect, not one but two parents.
Recitation of the foregoing benefits of adoption have revealed what a child, living with an unmarried couple, could lose if only one of two parents-in-fact is allowed to adopt under the law. This reality cannot be ignored. In this connection it is important to emphasize again that, in making the child’s “best interests” the “decisive consideration,” In re L.L., 653 A.2d at 880, the statute does not expressly prescribe any limitation on how the family, in the child’s “best interests,” shall be structured. The focus is on how the child shall best thrive, not on what the particular family format shall look like. See supra note 12.
We are satisfied that the paramount statutory purpose — the “best interests” of the adoptee — will be best served, and that no other affected interests protected by the statute will be ill served, by a liberal, inclusive interpretation of D.C.Code § 16-302 that says: unmarried couples, whether same-sex or opposite-sex, who are living together in a committed personal relationship, are eligible to file petitions for adoption under D.C.Code § 16-305. We so hold. We therefore finally can say that it is not “unreasonable” to conclude that D.C.Code § 49-202, as applied to unmarried couples, modifies D.C.Code § 16-302 to say “[a]ny persons” may petition for adoption. Accordingly, adoption petitions by unmarried couples shall be granted or rejected on a case-by-case basis in the best interests of the prospective adoptee (on the assumption that all other statutory requirements are met).
IV. Whether An Adoptive Parent’s Relationship with the Child will be Cut Off If that Parent’s Unmarried Life Partner is Permitted to Adopt
A. The “Stepparent Exception”
The final question is whether, despite the legality of an adoption by an unmarried couple in the best interests of the child, the “legal effects” provision, D.C.Code § 16-312(a) — quoted in full in Part III. B. above — would cut off Bruce’s relationship with Hillary as her adoptive (and thus “natural”) parent if Mark’s petition to adopt Hillary is granted. This provision has two discernible purposes: (1) to guarantee the adopted child’s right of “inheritance and succession” as though that child “had been born to the adopting parent or parents in lawful wedlock,” and (2) to “cut off’ all rights and duties between the natural parents and the adopted child, including those of inheritance and succession — “except that” no such “rights and relations,” including inheritance and succession, shall be altered in any way “when one of the natural parents is the spouse of the adopter.”
The specified exception reflects the typical stepparent situation identified in § 16-302. It recognizes that when a natural parent remarries and plans to live with his or her children and new spouse as a family unit, the statutory “cut off’ requirement — terminating *860 the birth parent’s rights so that the adopting parent and child can begin a new family without interference by the birth parent — • does not apply. Indeed, an important goal of adoption, to “strengthen the [ ] family as a social unit,” Application of Sage, 21 Wash.App. 803, 586 P.2d 1201, 1203 (1978), would be frustrated altogether if adoption by a stepparent would terminate the parental relationship between the birth parent and the child with whom both parents plan to live.
The trial court concluded that the cut-off language of § 36-312 is mandatory, not directory, and that its literal limitation to preserving the parental rights of the “spouse” of an adopting stepparent would preclude its use to save Bruce’s parental rights if Mark were allowed to adopt Hillary. To the contrary, we do not hesitate to hold that this stepparent exception applies here, even though the natural parent (by adoption), Bruce, is not the “spouse of the adopter,” Mark.
In the first place, the stepparent exception easily applies here by analogy; Bruce and Mark are living together in a committed personal relationship, as though married, and are jointly caring for Hillary as their child.
Second, we have held that the particular provisions in § 16-302 referring to adoption by a married couple do not foreclose adoption by an unmarried couple. Section 16-312, which announces the “legal effects” of adoption, does not apply unless and until a petitioner qualifies for adoption under § 16-302, which prescribes “who may adopt.” Accordingly, § 16-312 is subject to the fundamental inclusiveness of § 16-302. It follows that the stepparent exception — reflecting the married couple example identified in § 16-302 — cannot be limited exclusively to couples who marry. Were we to limit the exception literally to a stepparent, forcing a cutoff of Bruce’s parental rights if Mark were allowed to adopt, we would be interpreting the plain language of the statute in a way that imposes “absurd results” and “obvious injustice,” Peoples Drug Stores, 470 A.2d at 754, whenever two unmarried persons, one of whom has adopted a child, decide to live together and form a family with that child. See also Adoption of B.L.V.B., 628 A.2d at 1274 (“unreasonable and irrational result”). If the limitation were literally applied, unmarried couples who simultaneously seek to adopt a child could do so unaffected by the “cut off’ provision of § 16-312(a), whereas unmarried couples in Bruce’s and Mark’s situation could not do so — a result that would make no sense whatsoever, and would clearly harm the child if joint adoption were in the child’s best interests.
Finally, the case law supports extending the § 16-312 stepparent exception to Mark’s, Bruce’s, and Hillary’s situation. In In re J.H., we held that D.C.Code §§ 16-302 and - 312(a) authorized a father of an illegitimate child to adopt the child, with the natural mother’s consent, in order to “make him the petitioner’s heir-at-law.” 313 A.2d at 874. The mother and father apparently were not married. Although the § 16-312 “cut off’ issue was not raised, it did not appear that the mother was giving up her child, and there was not a hint that the adoption would affect her parental rights.
In Adoption of B.L.V.B., the Supreme Court of Vermont applied a statutory scheme that included a “cut off’ provision with a “stepparent” exception similar to D.C.Code § 16-312(a). One member of a committed, same-sex couple (Jane) had given birth to two sons after artificial insemination by an anonymous sperm donor; her partner (Deborah) sought “to legally adopt the children, while leaving Jane’s parental rights in tact.” 628 A.2d at 1272. The probate court denied the adoption on purely legal grounds; the Supreme Court of Vermont reversed. With respect to the interplay between the “cut off’ provision and the “stepparent” exception, as they affected Jane’s rights upon Deborah’s adoption of Jane’s children, the court opined:
The statute also terminates the natural parents’ rights upon adoption, but this provision anticipates that the adoption of children will remove them from the home of the biological parents, where the biological parents elect or are compelled to terminate their legal obligations to the child. This legislative intent is evidenced by the stepparent exception, which saves the natural parent’s rights in a stepparent adoption. The legislature recognized that it would be *861 against common sense to terminate the biological parent’s rights when that parent will continue to raise and be responsible for the child, albeit in a family unit with a partner who is biologically unrelated to the child.
Although the precise circumstances of these adoptions may not have been contemplated during the initial drafting of the statute, the general intent and spirit of 8 448 [the “cut off’ provisionj is entirely consistent with them. The intent of the legislature was to protect the security of family units by defining the legal rights and responsibilities of children who find themselves in circumstances that do not include two biological parents. Despite the narrow wording of the step-parent exception, we cannot conclude that the legislature ever meant to tenninate the parental rights of a biological, pa-rent ivho intended to continue raising a child with the help of a partner. Such a narrow construction would produce the unreasonable and irrational result of defeating adoptions that are otherwise indisputably in the best interests of children.
628 A.2d at 1274 (citation omitted) (emphasis added). Other courts have held the same. See Adoption of Tammy, 619 N.E.2d at 321 (sustaining joint petition for adoption of child by biological mother and her same-sex, committed life partner, without termination of biological mother’s parental relationship under termination provision similar to D.C.Code § 16-312(a)); In re Evan, 153 Misc.2d 844, 583 N.Y.S.2d 997, 1000 (Sur.Ct.1992) (upholding adoption of child by biological mother’s same-sex partner under statutory provision similar to D.C.Code § 16-312(a)); but see In Interest of Angel Lace M., 184 Wis.2d 492, 516 N.W.2d 678, 683 & nn. 8-9, 11 (1994) (unmarried mother’s life partner could not adopt child without terminating mother’s parental rights because statute literally required such termination unless birth parent is spouse of adoptive parent).
In light of the logic inherent in the statutory scheme, and given the case law where courts have extended “stepparent” exceptions under “cut off’ provisions to cover unmarried, though personally committed, same-sex couples, we are satisfied that § 16-312(a) is no impediment to Bruce’s retaining his parental relationship with Hillary upon Mark’s adoption of Hillary.
B. Rejection of Possible Alternative Analysis
As indicated in our preliminary observation, see supra Part III. A., theoretically, perhaps, we could have begun the analysis more narrowly by focusing on the fact that one person, Mark — qualifying as “La]ny person” under § 16-302 — has filed a petition for adoption of a child for whom Bruce already had become a natural parent through earlier adoption. The burden of the analysis would then have shifted right away to § 16-312(a), appearing to present only the one question whether Mark could adopt Hillary without cutting off Bruce’s parental rights. The Supreme Court of Wisconsin, three justices dissenting, focused the analysis in this way on the “stepparent exception” and answered the question “no”; the first parent’s rights 'would be cut off because the exception applied only to a married couple. See In Interest of Angel Lace M., 516 N.W.2d at 684. In considering a case in which a natural mother’s same-sex life partner sought to adopt the mother-partner’s child, the Wisconsin court relied on statutory language providing that an adoption will cut off all rights of the natural parent “unless the birth parent is the spouse of the adoptive parent.” Id. Then, applying the expressio unius maxim, the court held that no other exceptions wei’e authorized. See id.
The court declined to conceptualize the case as one essentially presenting a threshold question whether an unmarried couple could adopt a child, saying that only one member of the couple had filed the petition and thus that “[t]he validity of a joint adoption [was] not before this court.” Id. at 684 n. 14 It is important to note, however, that the Wisconsin statute was similar to the 1895 District of Columbia statute — unlike the 1954 statute now before this court. Wisconsin authorized adoptions by “[a] husband and wife jointly,” by a stepparent, or by “[a]n unmarried adult.” Id. at 682 n. 4. Thus, based on plain statutory language, the question whether unmarried couples were entitled to adopt would *862 have been difficult to answer in the affirmative. But more to the point for the present case, and contrary to the Wisconsin Supreme Court’s narrow conceptualization, the fundamental question is whether an unmarried couple is authorized to adopt. The answer should not depend on whether one member of the couple already has parental rights; the answer should not turn on the number of new parents the child is to receive.
Furthermore, the District of Columbia adoption statute makes clear that the “cutoff’ question is subordinate to the eligibility question. The “cut-off’ provision, § 16-312(a), pertains to the legal effects of adoption, the lawfulness of which is established under § 16-302. While the adoption statute should be read as a whole to help derive the meaning, as needed, of each particular provision, the question has to begin with, and be answered for, the up-front provision, § 16-302, captioned “persons entitled to adopt.” If an unmarried couple is eligible to adopt, then the § 16-312(a) cut-off provision has to be interpreted with that authorization in mind; if an unmarried couple is not eligible to adopt, then the cut-off provision would merely reflect that fundamental reality. Broadly understood, the Wisconsin decision reflects this latter result, derived from a statute where, expressly, the only couple authorized to adopt is a “husband and wife.”
As we elaborated earlier, the highest courts of Massachusetts, in Adoption of Tammy, and of Vermont, in Adoption of B.L.V.B., took the approach we have pursued here — and with the same result.
V. Conclusion
For the foregoing reasons, we conclude that unmarried couples living together in a committed personal relationship, whether of the same sex or of opposite sexes, are eligible to “petition the court for a decree of adoption” under D.C. § 16-302. We further conclude that, when one of the natural parents (by birth or adoption) is living in a committed personal relationship with the prospective adoptive parent, then pursuant to D.C.Code § 16-312(a) “the rights and relation as between adoptee, that natural [including adoptive] parent, and his [or her] parents and collateral relations, including natural rights of inheritance and succession, are in no wise altered.”
We therefore reverse and remand the case for further proceedings consistent with this opinion.

So ordered.

. According to the trial judge, "Hillary's biological father's consent to the adoption was waived after unsuccessful efforts were made to notify him, to locate him, and to secure his consent, vel non.”

. Because the statutory eligibility question is the same whether the unmarried persons seeking to adopt comprise a same-sex or an opposite-sex couple living together in a committed personal relationship, we use the simpler and broader term, "unmarried couple,” to describe the class at issue.

. The trial judge added that strict construction of the statute was warranted to "avoid future disturbances of the resultant family relationship created between the adopter and the adoptee," and that the "best interest of the child” standard could not be deemed to override strictly construed statutory provisions.

. See, e.g., S.O. v. W.S., 643 P.2d 997, 1002 n. 7 (Alaska 1982) ("the better rule is to construe adoption statutes in a manner that will promote [the welfare of the child]”); San Diego County Dept. of Public Welfare v. Superior Court of San Diego County, 7 Cal.3d 1, 101 Cal.Rptr. 541, 551, 496 P.2d 453, 463 (1972) (adoption statute "is to be given a liberal construction with a view to effect its objects and to promote justice”) (internal quotes and citations omitted); In re Backhaus' Adoption, 209 Cal.App.2d 13, 25 Cal.Rptr. 581, 584 (1962) ("our Supreme court [has] approved the rule of liberal construction of adoption statutes and expressly disapproved ... strict construction.”); Stjernholm v. Mazaheri, 180 Colo. 352, 506 P.2d 155, 157 (1973) (adoption statutes "arc given a liberal construction”); Herrin v. Graham, 87 Ga.App. 291, 73 S.E.2d 572, 573 (1952) ("The modern tendency is to give adoption statutes a liberal construction in order to effect their benevolent purposes and to promote the welfare of the child sought to be adopted.”); In re Adoption of Schumacher, 120 Ill.App.3d 50, 75 Ill.Dec. 926, 931, 458 N.E.2d 94, 99 (1983) ("The liberal construction rule ... was designed to alleviate the harsh results of the former requirement of strict construction”); Matter of Adoption of Thomas, 431 N.E.2d 506, 512 (Ind.App.1982) ("The adoption statute is not to be so strictly construed as to defeat its purposes.”); In re Neil's Estate, 187 Neb. 364, 191 N.W.2d 448, 450 (1971) ("Since 1897, Nebraska has been in the vanguard of those states applying a liberal rather than a strict construction to adoption statutes.”); Matter of Adoption of Michelle N., 577 P.2d 68, 72 (Okla.1978) ("adoption statutes are generally given a liberal construction”) (citation omitted); Homfeld v. Pence, 487 S.W.2d 224, 227 (Tex.App.1972) ("adoption statutes are to be liberally construed in favor of the minors in order to effectuate their beneficial purpose”); Lee v. Calvert, 356 S.W.2d 840, 844 (Tex.App.1962) ("our adoption statutes ... should be given a liberal construction.”); see also Homer H. Clark, Jr., Law of Domestic Relations § 18.3, at 614 (1968) (liberal construction of adoption statutes "with a view to effectuating statutory policies” is preferable to strict construction).

.We do not address the possibility of adoption by more than two persons (e.g., an adoption by three siblings, living together, of a deceased sibling's child), not only because that issue is not presented here but also because that hypothetical possibility is likely to require consideration of issues not involved in adoption by a couple living together. Nor, for the same reasons, do we consider adoption by two persons who are not living together in a committed personal relationship. As to both of these hypothetical situations, however, we note that, even if such adoptions were allowable under the statute, other statutory constraints — most notably the "best interests of the prospective adoptee,” D.C.Code § 16-309(b)(3) — might dictate otherwise in a particular case.

. Law of March 3, 1901, ch. 854, 31 Stat. 1189.

. Adoption of Tammy, 416 Mass. 205, 619 N.E.2d 315, 319 (1993).

. Pub.L. No. 392, 68 Stat. 240 (1954).

. By presumptively requiring us to read "person” in § 16-302 as "persons,” the rule of § 49-202 arguably converts the analysis of the adoption statute in this particular context from strict construction to liberal construction, because it provides, in effect, that unmarried couples are eligible to adopt unless it "would be unreasonable” to believe such adoptions could further "the beneficial purposes that Congress had in mind." Zazove, 334 U.S. at 610, 68 S.Ct. at 1288.

. Law of February 26, 1895, ch. 134, 28 Stat. 687 (repealed 1937).

. See, e.g., Shamrock Oil & Gas Corp. v. Sheets, 313 U.S. 100, 106, 61 S.Ct. 868, 871, 85 L.Ed. 1214 (1941) ("We cannot assume that Congress, in thus revising the [federal remand] statute [to omit all references to plaintiffs'], was unaware of the history which we have just detailed" revealing earlier statutory language permitting plaintiffs as well as defendants to remove proceedings from state to federal court); Dupont Circle Citizen’s Ass'n v. District of Columbia Zoning Comm'n, 343 A.2d 296, 317 (D.C.1975) ("Under well established canons of construction, when a legislative body enacts an amendment in the nature of a substitute to a particular statute but omits an exemption contained in the original statute, such omission is presumed to be deliberate.”); Hickman v. Western Heating and Air Conditioning Co., 207 F.Supp. 832, 834 (N.D.Ind.1962) (“A statutory amendment which changes the language of a prior statute indicates a legislative intention that the meaning of the statute has been changed.") (citation omitted); Federal Ins. Co. v. Speight, 220 F.Supp. 90, 95 (E.D.S.C.1963) ("The general rule is that a change in phraseology indicates persuasively, and raises a presumption that a departure from the old law was intended, and amendments are accordingly construed to effect a change....”) (citing 50 Am.Jur. Statutes § 275). But see Ontell v. Capitol Hill E.W. Ltd., 527 A.2d 1292, 1296 (D.C.1987) ("While failure to enact an amendment to a bill may indicate a legislative intent to reject the amendment's provisions, it may also indícate a legislative assumption that the terms of the amendment were already implicit within the bill.”) (citing 2A Singer, Sutherland Statutory Construction § 48.18, at 341 (4th ed. 1984)).

. In Adoption of Tammy, 619 N.E.2d at 319 n. 4, the Supreme Judicial Court of Massachusetts noted that “[c]hildren in earlier times who lacked two married and living parents, just as many children today, were often adopted into ‘non-standard’ families,” such as an unwed mother’s adoption of her illegitimate child, see Petition of Curran, 314 Mass. 91, 49 N.E.2d 432 (1943), and a grandfather’s adopting his grandson, see Delano v. Bruerton, 148 Mass. 619, 20 N.E. 308 (1889). The court added that, by permitting adoption by an unmarried person, “the Legislature clearly sanctioned adoption into 'non-standard’ families.” Adoption of Tammy, 619 N.E.2d at 319 n. 4; see In re L.L., 653 A.2d 873 (D.C.1995) (terminating father's parental rights and allowing adoption by foster mother); In re D.R.M., 570 A.2d 796 (D.C.1990) (permitting single person to adopt child despite natural mother's withholding consent to adoption); Petition of D.I.S., 494 A.2d 1316 (D.C.1985) (grandmother adopting granddaughter); see also Merrill v. Berlin, 316 Mass. 87, 54 N.E.2d 674 (1944) (denying grandparents’ petition for adoption when deceased parent had expressed preference for custody of two boys in the "extremely intellectual and wholly feminine” household of the deceased mother's aunt and two female cousins).

. In contrast, there can be occasions when a legislature may not have contemplated a particular statutory application, one way or another, but must be said to have excluded it simply because the statutory language and scheme do not leave room for it. For example, in Dean, supra, we held that the District of Columbia’s substantially gender-neutral marriage statute does not authorize same-sex marriage. We concluded that the gender-specific language of the consanguinity' provision of the marriage statute, when coupled with the gender-specific language of the divorce statute (part of the relevant statutory' scheme) and with the traditional understanding of the word "marriage," left no doubt that same-sex marriages were excluded.

. See supra note 10.

. See 26 Cong.Rec. H3600 (daily ed. Apr. 9, 1894); In re Jarboe's Estates, 235 F.Supp. 505, 506 (D.D.C.1964).

. H.R. 5711, 53d Cong., 2d Sess. (1894); 26 Cong.Rec. H3599 (daily ed. Apr. 9, 1894).

. See id.; Law of February 26, 1895, ch. 134, 28 Stat. 687 (repealed 1937).

. P.L. No. 370, 75th Cong., 1st Sess., ch. 774 (Aug. 25, 1937) 50 Stat. 806 (amended 1954).

. Id. § 1.

. Id. § 5.

. Id.

. H.R.Rep No 1347, 83d Cong., 2d Sess. (1954), at 2.

. See supra note 8.

. See H.R.Rep. No. 1347, 83d Cong., 2d Sess. (1954); S.Rep. No. 1379, 83d Cong., 2d Sess. (1954); 100 Cong.Rec. H4986-H4988 (daily ed. Apr. 12, 1954); 100 CongRec. H7001 (daily ed. May 24, 1954); 100 Cong.Rec. H7056 (daily ed. May 25, 1954); H.R.Rep. No 1583, 75th Cong., 1st Sess. (1937) (in lieu of H.R.Rep. No. 1274, 75th Cong., 1st Sess. (1937)); S.Rep. No. 1034, 75th Cong., 1st Sess. (1937); 81 Cong.Rec. H8408-H8409 (daily ed. April 6, 1937); 81 Cong. Rec. H8565-H8566 (daily ed. Aug. 9, 1937); 81 CongRec H8731 (daily ed. Aug. 12, 1937); 81 Cong.Rec. H9182 (daily ed. Aug. 17, 1937); 81 Cong.Rec. H9200 (daily ed. Aug. 18, 1937).

. See supra note 11.

. See Browder, 312 U.S. at 339-40, 61 S.Ct. at 601-02; Rosenberg, 297 A.2d at 765.

. Perhaps someone could argue that the 1895 adoption statute established the rules — adoption by “a [single] person” or by "a husband and wife” — and that the 1954 statute retained that dichotomy by allowing adoption, explicitly, by ”[a]ny person” and, implicitly, by married persons, as evidenced by the express rules prescribed for spouses. There are at last two problems with this analysis: it ignores the intervening 1937 statute, which had no provision governing who may adopt, and it is but a conclusory assertion that ignores all the other criteria that apply when construing an ambiguous statute.

. See Mack v. United States, 637 A.2d 430, 433 (D.C.1994) (in specifying several alternatives for relief, including various conditions of release when criminal defendant is not tried within period prescribed by Bail Reform Act, legislature implicitly intended to exclude dismissal of indictment from available remedies); J. Parreco & Son v. District of Columbia Rental Hous. Comm’n, 567 A.2d 43, 46-47 (D.C.1989) (in'statute governing landlord's hardship petition for increased rent, enumeration of items not deductible in calculating income from property implies there are no others); District of Columbia Dep’t of Corrections v. Teamsters Union Local No. 246, 554 A.2d 319, 323-24 (D.C.1989) (in listing 21 types of "cause” that can result in adverse action under Comprehensive Merit Personnel Act, without a "catchall” provision, Council implicitly excluded alleged basis for employee discharge not found on list); see also N. Singer, 2A Sutherland, Statutes and Statutory Construction §§ 47.23-47.25 (5th ed. 1992).

. See Springer v. Philippine Islands, 277 U.S. 189, 206, 48 S.Ct. 480, 483-84, 72 L.Ed. 845 (1928) ("Where a statute contains a grant of power enumerating certain things which may be done and also a general grant of power which standing alone would include these things and more, the general grant may be given full effect if the context shows that the enumeration was not intended to be exclusive.”); City of Lexington v. Commercial Bank, 108 S.W. 1095, 1096 (Mo.App.1908) ("if there is some special reason for mentioning one and none for mentioning the other, the absence of any mention of the latter will not operate as an exclusion, and ... the [expressio unius ] maxim does not apply to a statute in which mention is made by way of example....”).

. See Karl N. Llewellyn, Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are To Be Construed, 3 Vand. L.Rev 395 (1950) ("there are two opposing canons on almost every point”).

. D.C.Code § 49-202 essentially reflects this approach to the use of canons of construction; its rule of interpretation — singular should be read as plural — is limited by the reasonableness requirement that says, in effect, the rule does not apply if another approach, based on other sound interpretative criteria, is more persuasive. For this reason, we do not apply § 49-202 unless and until other traditional approaches to statutory construction so indicate. We use § 49-202 to buttress and confirm our analysis, not to dictate the result.

. See Middlesex County Sewerage Auth. v. National Sea Clammers Assoc., 453 U.S. 1, 14-15, 101 S.Ct. 2615, 2623-24, 69 L.Ed.2d 435 (1981); Texas Indus., Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 640 n. 11, 101 S.Ct. 2061, 2067 n. 11, 68 L.Ed.2d 500 (1981); Northwest Airlines v. Transport Workers Union, 451 U.S. 77, 93-94 & n. 30, 101 S.Ct. 1571, 1581-82 & n. 30, 67 L.Ed.2d 750 (1981); Mack, 637 A.2d at 433, supra note 28; Teamsters Union Local No. 246, 554 A.2d at 323-24, supra note 28.

. See Tennessee Valley Auth. v. Hill, 437 U.S. 153, 188, 98 S.Ct. 2279, 2298-99, 57 L.Ed.2d 117 (1978).

. See J. Parreco & Son, 567 A.2d at 47, supra note 28.

. See McCray, 504 A.2d at 1130.

. The Supreme Court has employed strict construction of broad statutory language to preserve the applicability of traditional legal rules which the statute itself failed to address. For example, in Liparota v. United States, 471 U.S. 419, 425-28, 105 S.Ct. 2084, 2088-90, 85 L.Ed.2d 434 (1985), the Court held that conviction for food stamp fraud under 7 U.S.C. § 2024(b)(1) requires proof of mens rea, an element of the crime derived from a “background assumption of our criminal law,” as well as from the rule of “lenity,” in the absence of an explicit statutory requirement or clarifying legislative history to the contrary. Similarly, in Chiarella v. United States, 445 U.S. 222, 233, 100 S.Ct. 1108, 1117, 63 L.Ed.2d 348 (1980), the Court held that under § 10(b) of the Securities Exchange Act of 1934 a financial printer's employee who had inside information about an intended corporate takeover had no duty to disclose that information to the sellers from whom he purchased the stock in an impersonal market transaction, "absent some explicit evidence of congressional intent” to change "established doctrine” basing fraud on privity between buyer and seller. In contrast, there is no "established doctrine” or “background assumption” to be enforced in the absence of express language in the adoption statute, that unmarried couples are categorically unsuitable for adoption of children.

. In rejecting the trial court’s view that the proposed adoption was outside the statute because it would create "a relationship that already exists,” In re J.H., 313 A.2d at 874-75, this court focused less on statutory language than on the purposes of the adoption statute and stressed, in particular, the petitioner’s desire to make the child "his heir-at-law.” Id. at 875.

. See McCarthy v. Bronson, 500 U.S. 136, 139, 111 S.Ct. 1737, 1740, 114 L.Ed.2d 194 (1991) ("In ascertaining the plain meaning of [a] statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.”) (citation and internal quotation marks omitted); Crandon v. United States, 494 U.S. 152, 158, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990) ("In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy.”); Capitol Hill Hosp. v. District of Columbia, 600 A.2d 793, 802 (D.C.1991) ("The legislative history does not provide an answer to the statutory omission at issue here.... Thus, our responsibility is to effectuate the legislative purpose ... by an examination of the statute as a whole.") (citations and internal quotation marks omitted); Giles v. District of Columbia, 548 A.2d 48, 57 (D.C.1988) ("Absent plain language or legislative history that would dictate a particular interpretation, and mindful of our responsibility in such a situation to try to effectuate the legislative purpose in a way that avoids 'absurd results' and 'obvious injustice,’ ... we conclude that the better interpretation of § 33-556 would be an expansive one.”) (citation omitted); J.H. Westerman Co. v. Fireman’s Fund Ins. Co., 499 A.2d 116, 120 (D.C.1985) ("Even though we find a 'superficial clarity’ in the plain meaning of a statute, we will look to the legislative history to determine if it reveals ambiguities or to effectuate the legislative purpose.”) (citation omitted); Logan v. United States, 483 A.2d 664, 676 (D.C.1984) ("While recognizing that a search for the actual intent of the legislature is often unrealistic, ... we are convinced that the purpose of the relevant language in § 16-2301(3)(A) is to authorize the prosecution of certain juveniles as adults only when they are charged with an assault committed with a malicious intent to kill.”) (citation omitted); District of Columbia v. Orleans, 132 U.S.App.D.C. 139, 141, 406 F.2d 957, 959 (1968) ("the 'plain meaning’ doctrine has always been subservient to a truly discernible legislative purpose however discerned, by equitable construction or recourse to legislative history.”).

. See Fed.R.Evid 201(b) (forbidding judicial notice of facts subject to reasonable dispute or of facts not capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned); see also Berkshire Fashions, Inc. v. M.V. Hakusan II, 954 F.2d 874, 885 n. 6 (3d Cir.1992) ("Although the court is free to take notice of the distance of the alternate maritime route, ... it is inappropriate to notice judicially that parties would never contract for shipment over that geographical distance.”) (internal citation omitted); Pina v. Henderson, 752 F.2d 47, 50 (2d Cir.1985) ("The existence and the content of [Patrolman] Dietl’s report [allegedly containing co-defendant’s statement absolving appellant] are not matters beyond dispute[,]” and thus "[w]hether the report was even prepared is not a proper subject of judicial notice.’’); United States v. Medina, 1992 WL 27082, *1 (S.D.N.Y.) (The court cannot take "judicial notice of the fact that the vast majority of people charged with possession of crack are black or hispanic and poor, and that the vast majority of those charged with possession of powdered cocaine are white and affluent.”).

.The best interests of the child often are affected by to the contending interests of natural parents, relatives, foster parents, and other prospective adoptive parents, as well as by the constitutional rights of contending parties; but in all instances, however those other interests are factored into the situation, they are either held subordinate to, or at least found consistent with, the child’s best interest. See generally Appeal of H.R., 581 A.2d 1141, 1153-59 (D.C.1990) (opinion of Ferren, J.).

. We find it unnecessary to discuss criteria that apply to adoptions of adults. See D.C.Code §§ 16-301 (referring to adoption of an "adult or child”); -303 (permitting adoption of a "person, whether a minor or an adult"); -308 (dispensing with certain requirements for adopted "adult”).

. In doing so, we shall not be finding facts; that is a trial court function, which the trial court has not as yet exercised here. Rather, we shall be referring to the kinds of benefits a child would receive from having two parents, not just one, *858 when the child lives with a committed unmarried couple who arc well suited to raising that particular child. Technically, therefore, we use the parties' names only for convenience.

. See, e.g., D.C.Code §§ 3-213.1(a) (responsible relative for recipient of public assistance); 16-2325 (parent's obligation to pay for treatment and support of child when legal custody vested in another), -2326 (parent's obligation to pay court costs and expenses for child’s treatment); 19-101(b) (child’s right to allowance out of estate of deceased parent); 21-586 (parent’s financial responsibility for support and treatment of mentally ill child), -1102 (parent’s financial responsibility to child confined at Forest Haven).

. See, e.g., D.C.Code §§ 16-577 (per centum limitation on attachment not to apply to child support obligations); -2341 (child’s right to bring support action against parent); 30-309 (child’s right to bring support action through next friend of minor).

. If Mark became a public employee, for example, then Hillary would be entitled to statutory benefits. See, e.g., D.C.Code §§ 1-622.3 (definition of "member of family” in public employee health insurance), -623.8(a)(3) (public employee life insurance), -624.10(a)(2) (definition of “dependent" in public employee disability insurance), -627.4(6) (definition of “party in interest” in public employee retirement benefits). As a private employee, Mark presumably could obtain similar benefits for Hillary under his employer’s plans.

. See generally, D.C.Code §§ 6-1967 (lawful authority to give informed consent in medical emergency); 16-2301(22) ("residual parental rights and responsibilities” defined in context of child delinquency, neglect, or need of supervision proceedings), -2311 (release of child to parent or guardian), -2324 (return of child to parent after Family Division commitment); 21-2210 (preference to parent or child in giving substituted consent for other's health care in absence of durable power of attorney); 36-509(4) (parent’s written consent needed for work or vacation permit for minor child).

. See, e.g., D.C.Code §§ 2-1502(b)(2) (power to make anatomical gifts), -1507(a) (power to dispose of body after making anatomical gifts), - 2813 (power to claim human remains); 5-825(b) (priority in housing of displaced persons); 10-225(f) (succession to deceased’s retail distributor marketing agreement); 16-907 (parent and child relationship defined), -2310(b) (child not to be detained prior to hearing unless child has no parent or guardian); 20-303(a) (priority in appointment as personal representative in administration of deceased parent’s estate); 21-2042(a) (child’s and parent's right to notice of the other’s guardianship proceeding), -2043 (child's and parent's preference in serving as the other's guardian), -2055 (exercise of court's power for benefit of incompetent person's family), -2057 (preference to parent and child in serving as conservator for the other’s estate).

. See, e.g., D.C.Code §§ 16 — 2304(b)( 1) (parent’s right to counsel in child neglect proceedings), - 2307(a) (service of summons on parent for child’s delinquency or neglect proceeding), - 2312 (notice of child’s detention to parent and right to be heard), -2333(b)(7) (parent's right to inspect child’s scaled record), -2357 (parent’s right to notice of a motion to terminate parent and child relationship), -4504 (parent’s right to *859 notice and opportunity to be heard in child custody hearing); 21-101 (parent defined as "natural guardian” of minor child), -105 (parent’s right to deed a guardian by will for property of minor child), -107 (parent gets priority in appointment as guardian of minor child's estate), - 114 (parent required to give bond or security to account for minor child's property), -301 (parent defined as "member of family” for transfers to minors), -511 (parent's power to commit minor as voluntary patient in mental hospital), -512 (parent's power to obtain release of minor child from mental hospital), -522 (parent’s right to notice of child’s admission to mental hospital), - 541 (parent's right to petition for hospitalization of child), -546 [parent's right to request mental health examination), -564 (parent’s right to notice of child's incompetence determination), -565 (parent’s right to notice of release procedures); 30-104 (parent's power to institute proceeding to nullify minor child’s marriage); 36 — 1302(a)(2) (parent's right to family leave for adoption of child), -1302(a)(4) (parent's right to family leave to care for sick child).