86 N.Y.2d 651 (1995)
660 N.E.2d 397
636 N.Y.S.2d 716
In the Matter of Jacob, an Infant. Roseanne M. A. et al., Appellants.
In the Matter of Dana. G. M., Appellant.
Court of Appeals of the State of New York.
Argued June 5, 1995.
Decided November 2, 1995.
Johnson, Atkinson, Getnick & Livingston, Utica (Nicholas S. Priore of counsel), for appellants in the first above-entitled proceeding.
No appearance for respondent in the first above-entitled proceeding.
Lambda Legal Defense and Education Fund, Inc., New York City (Beatrice Dohrn of counsel), and Weil, Gotshal & Manges (Harris J. Yale and Victoria A. Kummer of counsel), for Lambda Legal Defense and Education Fund, amicus curiae pro se, in the first above-entitled proceeding.
Lambda Legal Defense and Education Fund, Inc., New York City (Beatrice Dohrn of counsel), for appellant in the second above-entitled proceeding.
No appearance for respondent in the second above-entitled proceeding.
Ruth E. Harlow, New York City, Marc E. Elovitz, Arthur Eisenberg and Donna Lieberman for American Civil Liberties Union and another, amici curiae in the second above-entitled proceeding.
Janet Gallagher, New York City, for Association of the Bar of the City of New York, amicus curiae in the second above-entitled proceeding.
Susan L. Hendricks, New York City, and Laura R. Johnson for Center Kids and others, amici curiae in the second above-entitled proceeding.
Judges SMITH, LEVINE and CIPARICK concur with Chief Judge KAYE; Judge BELLACOSA dissents and votes to affirm in a separate opinion in which Judges SIMONS and TITONE concur.
*655 Chief Judge KAYE.
Under the New York adoption statute, a single person can adopt a child (Domestic Relations Law § 110). Equally clear is the right of a single homosexual to adopt (see, 18 NYCRR 421.16 [h] [2] [qualified adoption agencies "shall not * * * *656 reject[] [adoption petitions] solely on the basis of homosexuality"]). These appeals call upon us to decide if the unmarried partner of a child's biological mother, whether heterosexual or homosexual, who is raising the child together with the biological parent, can become the child's second parent by means of adoption.
Because the two adoptions sought  one by an unmarried heterosexual couple, the other by the lesbian partner of the child's mother  are fully consistent with the adoption statute, we answer this question in the affirmative. To rule otherwise would mean that the thousands of New York children actually being raised in homes headed by two unmarried persons could have only one legal parent, not the two who want them.
The Adoptions Sought
In Matter of Jacob, Roseanne M. A. and Jacob's biological father (from whom she is divorced) separated prior to the child's birth and Roseanne M. A. was awarded sole custody. Jacob was a year old when Stephen T. K. began living with him and his mother in early 1991. At the time of filing the joint petition for adoption three years later, Stephen T. K. was employed as a programmer/analyst with an annual income of $50,000, while Roseanne M. A. was a student at SUNY Health Center. Jacob's biological father consented to the adoption.
Though acknowledging that "the granting of an adoption in this matter may be beneficial to Jacob," Family Court dismissed the petition for lack of standing on the ground that Domestic Relations Law § 110 does not authorize adoptions by an unmarried couple. The Appellate Division affirmed, two Justices dissenting (210 AD2d 876), and an appeal to this Court was taken as of right.
In Matter of Dana, appellants are G. M. and her lesbian partner, P. I., who have lived together in what is described as a long and close relationship for the past 19 years. G. M. works as a special education teacher in the public schools earning $38,000 annually and P. I., employed at an athletic club, has an annual income of $48,000. In 1989, the two women decided that P. I. would have a child they would raise together. P. I. was artificially inseminated by an anonymous donor, and on June 6, 1990, she gave birth to Dana. G. M. and P. I. have shared parenting responsibilities since Dana's birth *657 and have arranged their separate work schedules around her needs. With P. I.'s consent, G. M. filed a petition to adopt Dana in April 1993.
In the court-ordered report recommending that G. M. be permitted to adopt (see, Domestic Relations Law § 116), the disinterested investigator described Dana as an attractive, sturdy and articulate little girl with a "rich family life," which includes frequent visits with G. M.'s three grown children from a previous marriage "who all love Dana and accept her as their baby sister." Noting that G. M. "only has the best interest of Dana in mind," the report concluded that she "provides her with a family structure in which to grow and flourish."
As in Matter of Jacob, Family Court, while conceding the favorable results of the home study and "in no way disparaging the ability of [G. M.] to be a good, nurturing and loving parent," denied the petition for lack of standing. In addition, the court held that the adoption was further prohibited by Domestic Relations Law § 117 which it interpreted to require the automatic termination of P. I.'s relationship with Dana upon an adoption by G. M. Despite its conclusion that G. M. had standing to adopt, the Appellate Division nevertheless affirmed on the ground that Domestic Relations Law § 117 prohibits the adoption (209 AD2d 8). We granted leave to appeal.
Limiting our analysis, as did the courts below, to the preserved statutory interpretation issues, we conclude that appellants have standing to adopt under Domestic Relations Law § 110 and are not foreclosed from doing so by Domestic Relations Law § 117. There being no statutory preclusion, we now reverse the order of the Appellate Division in each case and remit the matter to Family Court for a factual evaluation and determination as to whether these adoptions would be in the best interest of the children.
The Context of our Statutory Analysis
Two basic themes of overarching significance set the context of our statutory analysis.
First and foremost, since adoption in this State is "solely the creature of * * * statute" (Matter of Eaton, 305 N.Y. 162, 165), the adoption statute must be strictly construed. What is to be construed strictly and applied rigorously in this sensitive area of the law, however, is legislative purpose as well as legislative language. Thus, the adoption statute must be applied in harmony with the humanitarian principle that adoption *658 is a means of securing the best possible home for a child (see, Matter of Malpica-Orsini, 36 N.Y.2d 568, 571-572).
Ten years ago, in Matter of Robert Paul P. (63 N.Y.2d 233), we refused to allow the adoption of a 50-year-old man by his 57-year-old homosexual partner even though the statutory language permitted the adoption. Our refusal in Robert Paul P. rested solely on the fact that the adult adoption sought in that case would have been "wholly inconsistent with the underlying public policy of providing a parent-child relationship for the welfare of the child" (id., at 236).
The very next year, in Matter of Best (66 N.Y.2d 151), we again chose not to construe the words of the adoption statute strictly, declining to permit an adopted child to inherit under the will of his biological grandmother because "[p]owerful policy considerations militate against construing a class gift to include a child adopted out of the family" (id., at 155). One commentator has characterized our decision in Best as "in defiance of * * * the text of the Domestic Relations Law * * * yet in accordance with current societal views of adoption and the adoptive relationship" (Note, When Blood Isn't Thicker Than Water: The Inheritance Rights of Adopted-Out Children in New York, 53 Brooklyn L Rev 1007).
What Matter of Robert Paul P. and Matter of Best underscore is that in strictly construing the adoption statute, our primary loyalty must be to the statute's legislative purpose  the child's best interest. "The adoptive family arises out of the State's concern for the best interest of the child" (People ex rel. Sibley v Sheppard, 54 N.Y.2d 320, 327). This profound concern for the child's welfare is reflected in the statutory language itself: when "satisfied that the best interests of the * * * child will be promoted thereby," a court "shall make an order approving the adoption" (Domestic Relations Law § 114 [emphasis added]).
This policy would certainly be advanced in situations like those presented here by allowing the two adults who actually function as a child's parents to become the child's legal parents. The advantages which would result from such an adoption include Social Security and life insurance benefits in the event of a parent's death or disability, the right to sue for the wrongful death of a parent, the right to inherit under rules of intestacy (see, In re Tammy, 416 Mass 205, 619 NE2d 315, 320) and eligibility for coverage under both parents' health insurance policies. In addition, granting a second parent *659 adoption further ensures that two adults are legally entitled to make medical decisions for the child in case of emergency and are under a legal obligation for the child's economic support (see, Domestic Relations Law § 32).
Even more important, however, is the emotional security of knowing that in the event of the biological parent's death or disability, the other parent will have presumptive custody, and the children's relationship with their parents, siblings and other relatives will continue should the coparents separate. Indeed, viewed from the children's perspective, permitting the adoptions allows the children to achieve a measure of permanency with both parent figures and avoids the sort of disruptive visitation battle we faced in Matter of Alison D. v Virginia M. (see, 77 N.Y.2d 651, 656 ["Petitioner concedes that she is not the child's `parent' * * * by virtue of an adoption."]).
A second, related point of overriding significance is that the various sections comprising New York's adoption statute today represent a complex and not entirely reconcilable patch-work. Amended innumerable times since its passage in 1873, the adoption statute was last consolidated nearly 60 years ago, in 1938 (L 1938, ch 606). Thus, after decades of piecemeal amendment upon amendment, the statute today contains language from the 1870's alongside language from the 1990's.
Though courts surely must, and do, strive to give effect to every word of a statute, our analysis must recognize the difficulty  perhaps unique difficulty  of such an endeavor here. With its long, tortuous history, New York's adoption statute today is a far cry from a "methodical[ ] and meticulous[ ]" expression of legislative judgment (dissenting opn, at 683). That the questions posed by these appeals are not readily answerable by reference to the words of a particular section of the law, but instead require the traditional and often close and difficult task of statutory interpretation is evident even in the length of today's opinions  whichever result is reached.
Against this backdrop, we turn to the particular provisions at issue.[1]
*660 Domestic Relations Law § 110
Despite ambiguity in other sections, one thing is clear: section 110 allows appellants to become adoptive parents. Domestic Relations Law § 110, entitled "Who May Adopt," provides that an "adult unmarried person or an adult husband and his adult wife together may adopt another person" (Domestic Relations Law § 110). Under this language, both appellant G. M. in Matter of Dana and appellant Stephen T. K. in Matter of Jacob, as adult unmarried persons, have standing to adopt and appellants are correct that the Court's analysis of section 110 could appropriately end here.[2]
Endowing the word "together" as used in section 110 with the overpowering significance of enforcing a policy in favor of marriage (as the dissent does) would require us to rewrite the statute. The statute uses the word "together" only to describe married persons and thus does not preclude an unmarried person in a relationship with another unmarried person from adopting. Rather, by insisting on the joint consent of the married persons, the statutory term "together" simply insures that one spouse cannot adopt a child without the other spouse's knowledge or over the other's objection (see, L 1984, ch 218, Mem of State Dept of Social Services, 1984 McKinney's Session Laws of NY, at 3184). Since each of the biological mothers here is not only aware of these proceedings, but has expressly consented to the adoptions, section 110 poses no statutory impediment.[3]
The conclusion that appellants have standing to adopt is also supported by the history of section 110. The pattern of *661 amendments since the end of World War II evidences a successive expansion of the categories of persons entitled to adopt regardless of their marital status or sexual orientation. The language in section 110 permitting adoptions by "an adult or minor husband and his adult or minor wife together," for example, is the result of 1951 legislation intended to enlarge the class of potential adoptive parents to include minors (Bill Jacket, L 1951, ch 211, Mem of Assn of Bar of City of NY, Committee on State Legislation, at 119; 1943 Opns Atty Gen 260). The sponsors of the bill, passed during the Korean War, were concerned that the child of a young father drafted into the military would be unable to take his father's surname (Bill Jacket, L 1951, ch 211, Mem of Legal Aid Society, at 9).
Another illustration of such expansion is the 1984 amendment increasing the number of potential adoptive parents by permitting adoption by adults not yet divorced but living apart from their spouses pursuant to separation agreements. Supporting that amendment was New York's "strong policy of assuring that as many children as possible are adopted into suitable family situations" (Bill Jacket, L 1984, ch 218, Mem of Dept of Social Services, at 2 [June 19, 1984]). As explained, the amendment
"would further this policy by requiring prospective adoptive parents to be evaluated on the basis of their ability to provide appropriate care, parental guidance and the security of a permanent home and not on their marital status alone. * * * [T]he marital status of a person should have no predetermined effect on the ability of that person to provide appropriate care to an adopted child" (id.).
Consistent with this trend, the latest amendment to Domestic Relations Law § 110 further increased the number of potential adoptive parents by permitting adoptions by nondivorced adults who have lived apart from their spouses for 18 months (L 1991, ch 254).
These amendments reflect some of the fundamental changes that have taken place in the makeup of the family. Today, for example, at least 1.2 of the 3.5 million American households which consist of an unmarried adult couple have children under 15 years old, more than a six-fold increase from 1970 (see, Current Population Reports, Population Characteristics, US Bur of Census, Marital Status & Living Arrangements, P20-478, at IX [1993]). Yet further recognition of this transformation *662 is evidenced by the fact that unlike the States of New Hampshire and Florida (NH Rev Stat Annot § 170-B:4; Fla Stat Ann § 63.042 [3]), New York does not prohibit adoption by homosexuals. Indeed, as noted earlier, an administrative regulation is in place in this State forbidding the denial of an agency adoption based solely on the petitioner's sexual orientation (18 NYCRR 421.16 [h] [2]).
A reading of section 110 granting appellants, as unmarried second parents, standing to adopt is therefore consistent with the words of the statute as well as the spirit behind the modern-day amendments: encouraging the adoption of as many children as possible regardless of the sexual orientation or marital status of the individuals seeking to adopt them.
Domestic Relations Law § 117
Appellants having standing to adopt pursuant to Domestic Relations Law § 110, the other statutory obstacle relied upon by the lower courts in denying the petitions is the provision that "[a]fter the making of an order of adoption the natural parents of the adoptive child shall be relieved of all parental duties toward and of all responsibilities for and shall have no rights over such adoptive child or to his property by descent or succession" (Domestic Relations Law § 117 [1] [a]). Literal application of this language would effectively prevent these adoptions since it would require the termination of the biological mothers' rights upon adoption thereby placing appellants in the "Catch-22" of having to choose one of two coparents as the child's only legal parent.
As outlined below, however, neither the language nor policy underlying section 117 dictates that result.
The Language of Section 117. Both the title of section 117 ("Effect of adoption") and its opening phrase ("After the making of an order of adoption") suggest that the section has nothing to do with the standing of an individual to adopt, an issue treated exclusively in section 110 (see, at 660-662, supra). Rather, section 117 addresses the legal effect of an adoption on the parties and their property.
Also plain on the face of section 117 is that it speaks principally of estate law. Words such as "succession," "inheritance," "decedent," "instrument" and "will" permeate the statute. Read contextually, it is clear that the Legislature's chief concern in section 117 was the resolution of property disputes upon the death of an adoptive parent or child. As we observed in People ex rel. Sibley v Sheppard (54 N.Y.2d 320, supra), *663 where we declined to read section 117's termination language "overbroadly * * * [to] interfere with the court's ability to protect the best interest of the child" and thereby prohibit visits with the child's biological grandparents, the "bulk of the statute refers to intestacy and succession" (54 NY2d, at 325). Thus, from the very beginning of what is now section 117, both the scholarly commentary about the section and its dozen or so amendments have centered on issues of property rights and inheritance (see, e.g., L 1896, ch 272, § 64 [terminating right of biological parents to inherit from child, while allowing child to inherit from biological parents]; Second Report of Temporary St Commn on Modernization, Revision and Simplification of Law of Estates, Intestate Succession and the Adopted Child, 1963 NY Legis Doc No. 19, Report No. 1.2C, at 148; Comment, Judicial Limitations on the Rights of Adopted Children to Inherit from Their Natural Relatives as Issue, 60 St John's L Rev 329 [1986]).
It is of course true that this Court, in a 1937 case rejecting claims for support brought by a destitute adopted adult daughter against her biological father, interpreted the then-applicable version of section 117 as "mak[ing] the adopted child the natural child of the adoptive parent" and "reliev[ing] the natural parent from any responsibility for his child's support" (Betz v Horr, 276 N.Y. 83, 87, 88). The version of section 117 in effect at that time, however, did not contain current subdivision (1) (i), which, on its face, appears to limit the applicability of the entire first half of section 117  including the language concerning termination in subdivision (1) (a)  "only to the intestate descent and distribution of real and personal property" (Domestic Relations Law § 117 [1] [i] [emphasis added]).
Obviously, one cannot invoke the termination language in subdivision (1) (a) in its most literal sense and at the same time reject a literal application of the above-quoted language in subdivision (1) (i). A strict construction of the entire section would lead to the incongruous result that the termination language of subdivision (1) (a) is relevant only when there is a dispute as to intestate succession.
Significantly, the language in subdivision (1) (i) was added only recently (L 1986, ch 408), after the promulgation of the regulations providing that neither marital status nor sexual orientation may alone be determinative in an adoption proceeding (18 NYCRR 421.16 [h] [2]). In recommending passage of the 1986 amendment, the Law Revision Commission warned that:
"In distinguishing between various classes of adopted-out children, the Commission must base different treatment of some children on factors *664 which do not result in discrimination against certain classes of persons (e.g., nonmarital children, unwed parents, males, females) in a manner impermissible under the Equal Protection Clause * * * of the United States * * * or * * * New York State Constitution" (1986 Report of NY Law Rev Commn, 1986 McKinney's Session Laws of NY, at 2581).
This admonition indicates a concern that an unduly restrictive reading of section 117 could have the discriminatory and unintended effect of making unwarranted, detrimental distinctions between "nonmarital children" like the two children here and those children whose parents are married.
Given this warning, as well as the anomaly created by an unnecessarily literal reading of the statute, we conclude that neither subdivision (1) (a) nor subdivision (1) (i) was intended to have universal application.
Recent Statutory Amendments. Moving beyond the language and history of section 117 itself, our reading of the statute is further supported by recent amendments to other sections of the adoption law which provide elaborate procedural mechanisms for regulating the relationships between the child, the child's (soon-to-be former) biological parents and the persons who will become the child's parents upon adoption (see, Social Services Law § 383-c; Domestic Relations Law § 115-b).
In the context of agency adoptions, Social Services Law § 383-c, enacted in 1990 (L 1990, chs 479, 480), provides that biological parents willing to give their child up for adoption must execute a written instrument, known as a "surrender," stating "in conspicuous bold print on the first page" that "the parent is giving up all rights to have custody, visit with, write to or learn about the child, forever" (Social Services Law § 383-c [5] [b] [ii]).
The second category of adoption  private placement  is also regulated by a newly revised statute (L 1986, ch 817) requiring the execution of a written "consent" stating that "no action * * * may be maintained * * * for the custody of the child" (Domestic Relations Law § 115-b [1]). In fact, the procedure mandated by Domestic Relations Law § 115-b closely parallels that of Social Services Law § 383-c. Both statutes, for example, require biological parents to execute a document that effectively terminates parental rights. Both provisions require a *665 Judge or Surrogate (if the document is executed in court) to inform the biological parents of the consequences of their act, and advise them of their right to be represented by counsel (Social Services Law § 383-c [5] [b]; Domestic Relations Law § 115-b [2] [b]). More importantly, both statutes provide generally that the biological parents' "surrender" or "consent" may be revoked within 45 days, and that an adoption proceeding may not be commenced until after the expiration of that period (Social Services Law § 383-c [8] [b]; Domestic Relations Law § 115-b [4] [d]). Thus, by the time the adoptive parents become the child's legal parents, the biological parents have already formally agreed to relinquish their relationship with the child.
The procedural safeguards contained in Social Services Law § 383-c and Domestic Relations Law § 115-b  safeguards that reflect modern sensitivities as to the level of procedural protection required for waiver of parental rights  further indicate that section 117 does not invariably mandate termination in all circumstances. Under the language of section 117 alone, a biological mother's rights could theoretically be severed unilaterally, without notice as to the consequences or other procedural protections. Though arguably adequate in 1938 when the statute was enacted (L 1938, ch 606, § 1; cf., Matter of Bistany, 239 N.Y. 19 [Cardozo, J.]), such a summary procedure would be unlikely to pass muster today (see, e.g., Santosky v Kramer, 455 US 745, 768-770; Matter of Sarah K., 66 N.Y.2d 223, 237).
The above-described amendments to Social Services Law § 383-c and Domestic Relations Law § 115-b suggest that the Legislature in recent years has devised statutory vehicles other than section 117 to carefully regulate and restrict parental rights during the adoption process, again militating against a rigid application of subdivision (1) (a).
The Ambiguity Should Be Resolved in the Children's Favor. Finally, even though the language of section 117 still has the effect of terminating a biological parent's rights in the majority of adoptions between strangers  where there is a need to prevent unwanted intrusion by the child's former biological relatives to promote the stability of the new adoptive family  the cases before us are entirely different. As we recognized in Matter of Seaman (78 N.Y.2d 451, 461), "complete severance of the natural relationship [is] not necessary when the adopted person remain[s] within the natural family unit as a result of an intrafamily adoption."
One example of an adoption where the Legislature has explicitly acknowledged that termination is unwarranted is *666 when the child, with the consent of the biological parent, is adopted by a "stepparent" (Domestic Relations Law § 117 [1] [d]). A second, implicit exception occurs in the adoptions by teenage fathers authorized by the 1951 amendment to section 110 (see, at 661, supra). Since minor fathers adopting their own biological children are not "stepparents" under the language of Domestic Relations Law § 117 (1) (d), they would be prohibited from adopting were section 117's termination language to be mandatory in all cases. The seemingly automatic cut-off language of section 117 could not have been intended to bar these adoptions, however, since they are precisely what the Legislature sought to encourage in the first place.
Yet a third class of adoptions where complete termination of parental rights appears to be contrary to legislative intent are those adoptions contemplated by Social Services Law § 383-c, a completely new statute enacted five years ago. Specifically, New York law now allows the parties to an agency adoption to "agree to different terms" as to the nature of the biological parents' postadoptive relationship with the child. The statute thus expressly permits parties to agree that the biological parent will retain specified rights  such as visitation with the child  after the adoption, thereby authorizing "open adoptions" for the first time in this State (see, Carrieri, Supplementary Practice Commentaries, McKinney's Cons Laws of NY, Book 52A, Social Services Law § 383-c, 1995 Cum Ann Pocket Part, at 69).
A year prior to the enactment of Social Services Law § 383-c, this Court declined to sanction the concept of "open adoption" because of our belief that it was inconsistent with what we perceived to be section 117's requirement that termination of parental rights was mandatory in all cases (Matter of Gregory B., 74 N.Y.2d 77, 91 [citations omitted]). Significantly, when enacting Social Services Law § 383-c the very next year, the Legislature saw no need to amend Domestic Relations Law § 117. Again, if section 117 automatically terminated parental rights in all circumstances, it would have the practical effect of overriding the conditional surrender/" open adoption" provisions of Social Services Law § 383-c. By passing Social Services Law § 383-c as it did, the Legislature thus necessarily rejected the reading of section 117 articulated in Matter of Gregory B. (see, People ex rel. Sibley v Sheppard, 54 N.Y.2d 320, 325, supra).
Given the above, it is plain that an interpretation of section 117 that would limit the number of beneficial intrafamily adoptions cannot be reconciled with the legislative intent to authorize open adoptions and adoptions by minors. The coexistence *667 of the statute's seemingly automatic termination language along with these more recent enactments creates a statutory puzzle not susceptible of ready resolution.
One conclusion that can be drawn, however, is that section 117 does not invariably require termination in the situation where the biological parent, having consented to the adoption, has agreed to retain parental rights and to raise the child together with the second parent. Despite their varying factual circumstances, each of the adoptions described above  stepparent adoptions, adoptions by minor fathers and open adoptions  share such an agreement as a common denominator. Because the facts of the cases before us are directly analogous to these three situations, the half-century-old termination language of section 117 should not be read to preclude the adoptions here. Phrased slightly differently, "the desire for consistency in the law should not of itself sever the bonds between the child and the natural relatives" (People ex rel. Sibley v Sheppard, 54 N.Y.2d 320, 326, supra).[4]
"Where the language of a statute is susceptible of two constructions, the courts will adopt that which avoids injustice, hardship, constitutional doubts or other objectionable results" (Kauffman & Sons Saddlery Co. v Miller, 298 N.Y. 38, 44 [Fuld, J.]; see also, McKinney's Cons Laws of NY, Book 1, Statutes § 150). Given that section 117 is open to two differing interpretations as to whether it automatically terminates parental rights in all cases, a construction of the section that would deny children like Jacob and Dana the opportunity of having their two de facto parents become their legal parents, based solely on their biological mother's sexual orientation or marital status, would not only be unjust under the circumstances, but also might raise constitutional concerns in light of the adoption statute's historically consistent purpose  the best interests of the child. (See, e.g., Gomez v Perez, 409 US 535, 538 [Equal Protection Clause prevents unequal treatment of children whose parents are unmarried]; Plyler v Doe, 457 US 202, 220 [State may not direct the onus of parent's perceived "misconduct against his (or her) children"]; Matter of Burns v Miller Constr., 55 N.Y.2d 501, 507-510 [New York statute requiring child born out of wedlock to prove "acknowledgment" *668 by deceased parent did not further legitimate State interest]; see also, Matter of Best, 66 N.Y.2d 151, 160, n 4, supra).[5]
These concerns are particularly weighty in Matter of Dana. Even if the Court were to rule against him on this appeal, the male petitioner in Matter of Jacob could still adopt by marrying Jacob's mother. Dana, however, would be irrevocably deprived of the benefits and entitlements of having as her legal parents the two individuals who have already assumed that role in her life, simply as a consequence of her mother's sexual orientation.
Any proffered justification for rejecting these petitions based on a governmental policy disapproving of homosexuality or encouraging marriage would not apply. As noted above, New York has not adopted a policy disfavoring adoption by either single persons or homosexuals. In fact, the most recent legislative document relating to the subject urges courts to construe section 117 in precisely the manner we have as it cautions against discrimination against "nonmarital children" and "unwed parents" (see, at 664, supra). An interpretation of the statute that avoids such discrimination or hardship is all the more appropriate here where a contrary ruling could jeopardize the legal status of the many New York children whose adoptions by second parents have already taken place (e.g., Matter of Camilla, 163 Misc 2d 272; Matter of Evan, 153 Misc 2d 844; Matter of A. J. J., 108 Misc 2d 657).
Conclusion
To be sure, the Legislature that last codified section 117 in 1938 may never have envisioned families that "include[] two adult lifetime partners whose relationship is * * * characterized *669 by an emotional and financial commitment and interdependence" (Braschi v Stahl Assocs. Co., 74 N.Y.2d 201, 211). Nonetheless, it is clear that section 117, designed as a shield to protect new adoptive families, was never intended as a sword to prohibit otherwise beneficial intrafamily adoptions by second parents.
Accordingly, in each proceeding, the order of the Appellate Division should be reversed, without costs, the adoption petition reinstated and the matter remitted to Family Court for further proceedings consistent with this opinion.
BELLACOSA, J. (dissenting).
Judges Simons, Titone and I respectfully dissent and vote to affirm in each case.
These appeals share a statutory construction issue under New York's adoption laws. While the results reached by the majority are intended to have a benevolent effect on the individuals involved in these two cases, the means to those ends transform the legislative adoption charter governing countless other individuals. Additionally, the dispositional methodology transcends institutional limitations on this Court's proper exercise of its authority, fixed by internal discipline and by the external distribution of powers among the branches of government.
The majority minimizes the at-will relationships of the appellants couples who would be combined biological-adoptive parents in each case, but the significant statutory and legally central relevancy is inescapable. Unlike married and single parent households, each couple here cohabits only day-to-day, no matter the depth or length of their voluntary arrangements. Their relationships lack legal permanency and the State has not endowed them with the benefits and enforceable protections that flow from relationships recognized under color of law. Nowhere do statutes, or any case law previously, recognize de facto, functional or second parent adoptions in joint circumstances as presented here.
Specifically, in the respective cases, the availability of adoption is implicated because of the operation-of-law consequences under Domestic Relations Law § 117 based on: (1) the relationship of the biological parent and the putative adoptive child if a male and female unmarried cohabiting couple, one of whom is the biological mother of the child, jointly petitions to adopt the five-year-old child; and (2) the relationship of the biological parent and her child if the lesbian partner of the biological mother petitions alone to adopt the five-year-old child. Neither *670 case presents an issue of ineligibility because of sexual orientation or of discrimination against adoption on that basis, despite the majority's evocations in that regard.
The facts are uncontested and pertinently recited in the Chief Judge's opinion. In Matter of Jacob, Family Court, Oneida County, dismissed the petition on the ground that the petitioners are an unmarried couple. No best interests factual or evidentiary evaluations were undertaken. The court held that adoption proceedings are creatures of statute and that Domestic Relations Law § 110 does not authorize adoption by an unmarried couple. The Appellate Division, Fourth Department, affirmed (210 AD2d 876), concluding that the statute did not permit adoption by two unmarried persons together.
In Matter of Dana, Family Court, Putnam County, denied the adoption petition. The court held that (1) G. M. did not have standing to adopt pursuant to Domestic Relations Law § 110, since she did "not fall within any of the classifications under Domestic Relations Law Section 110"; and (2) the proposed adoption ran afoul of Domestic Relations Law § 117 (1) (a).
The Appellate Division, Second Department, unanimously affirmed (209 AD2d 8), but contrary to Family Court, it found that G. M. had standing to adopt under Domestic Relations Law § 110 as an "adult unmarried person." The Per Curiam opinion limited the dispositional rationale to the effect of Domestic Relations Law § 117  automatic termination of the biological parent's rights upon adoption by other than a stepparent. The Court, therefore, ruled that Family Court's result was correct for the reason that "[c]learly the intent of the Legislature was to deny a single person the right to adopt another's child while the natural parent, a single person, retains parental rights" (id., at 10).
Although adoption has been practiced since ancient times, the authorization for this unique relationship derives solely from legislation. It has no common-law roots or evolution (Matter of Seaman, 78 N.Y.2d 451, 455; Matter of Robert Paul P., 63 N.Y.2d 233, 237; Matter of Thorne, 155 N.Y. 140, 143; see generally, Presser, The Historical Background of the American Law of Adoption, 11 J of Fam L 443 [1971]). Therefore, our Court has approved the proposition that the statutory adoption charter exclusively controls (Matter of Robert Paul P., supra, at 238; Matter of Malpica-Orsini, 36 N.Y.2d 568, 572, appeal dismissed sub nom. Orsini v Blasi, 423 US 1042; Carpenter v Buffalo Gen. Elec. Co., 213 N.Y. 101, 108).
*671 The judicial role is most sensitive, but no case has ever recognized a judicially created right of adoption. This restraint is especially pertinent when the Legislature has expressly enacted a plenary, detailed legislative plan (see, Matter of Malpica-Orsini, supra, at 570; Matter of Eaton, 305 N.Y. 162, 165). The majority acknowledges New York's unique legislative developments and the several major cases in which adoptions have been disallowed (see, e.g., Matter of Robert Paul P., supra) that together document these juridically limiting principles, yet the majority's ruling and result paradoxically turn away from those consistent guideposts.
Pointedly, this Court's unqualified utterance is that "`"[t]he Legislature has supreme control of the subject"'" (Matter of Robert Paul P., supra, at 237 [emphasis added]; see also, Matter of Malpica-Orsini, supra). A transcendent societal goal in the field of domestic relations is to stabilize family relationships, particularly parent-child bonds. That State interest promotes permanency planning and provides protection for an adopted child's legally secure familial placement. Therefore, statutory authorizations should not be substantively transformed under the guise of interpretation, and all facets of the adoption statutes should be harmonized (see, Matter of Costello v Geiser, 85 N.Y.2d 103, 109; Heard v Cuomo, 80 N.Y.2d 684, 689; Matter of Long v Adirondack Park Agency, 76 N.Y.2d 416, 420, 422-423).
Notably, too, for contextual understanding of these cases, New York State has long refused to recognize common-law marriages (see, Domestic Relations Law § 11). It also does not recognize or authorize gay or lesbian marriages, though efforts to secure such legislation have been pursued (see, 1995 Assembly Bill A-648; 1994 Assembly Bill A-10508).

I.
Domestic Relations Law § 110, entitled "Who May Adopt," provides at its outset that "[a]n adult unmarried person or an adult husband and his adult wife together may adopt another person" (emphasis added). Married aspirants are directed to apply "together", i.e., jointly, as spouses, except under circumstances not applicable in these cases.
In Dana, appellant G. M. asserts that she may petition as "[a]n adult unmarried person," without regard to the legal consequences of other related provisions of the adoption charter. She petitioned individually and qualifies under section *672 110, irrespective of her sexual orientation. The Dana case, therefore, is not a case involving the right of homosexuals to adopt, nor, self-evidently, is the Jacob case. Satisfying the standing component does not, however, complete the analysis or overcome section 117's operation-of-law impact on both cases.
Appellants Stephen T. K. and Roseanne M. A. urge that the term "adult unmarried person" should also permit them to adopt "together" as an unmarried couple. They bypass the statute's plain words by claiming that nothing in the statutory language of Domestic Relations Law § 110 precludes their adoption effort. Preclusion or prohibition, however, are not the point. Petitioners' burden, ignored by the majority, is to identify a source of statutory authorization.
Petitioners came to court in the Jacob case to adopt "together," as two unmarried adults. The court must deal with them as they presented themselves and must also obey the statute that on its face allows a joint petition by "married" spouses "together." The statute unambiguously declares that "[a]n adult unmarried person or an adult husband and his wife together may adopt another person" (Domestic Relations Law § 110 [emphasis added]; Scheinkman, Practice Commentaries, McKinney's Cons Laws of NY, Book 14, Domestic Relations Law § 110, at 398, 402, 404). Words of such precise import and limitation are not merely talismanic and may not be rendered superfluous, as the majority has done here. The Legislature's chosen words must be given their substantive, intended meaning, and interpretation is no substitute for its failure to be more explicit or flexible.
The statutory language and its history instructively reveal no legislative intent or hint to extend the right and responsibility of adoption to cohabiting unmarried adults (see, Scheinkman, Supplementary Practice Commentaries, McKinney's Cons Laws of NY, Book 14, Domestic Relations Law § 110, 1995 Cum Ann Pocket Part, at 85). The opposite obtains, notably in the Jacob case, in the direct contraindication of Domestic Relations Law § 11 expressing the State's long-standing public policy refusal to recognize at-will common-law relationships as marriages. Confusion is thus sown by the holdings today by blurring plain meaning words and clear lines between relationships that are legally recognized and those that are not. Under the newly fashioned theory rooted in ambiguity, any number of people who choose to live together *673  even those who may not cohabit  could be allowed to adopt a child together. The result in these cases and reductio ad absurdum illustrations flowing from appellants' theorem  that singular may mean plural and vice versa under a general axiom of statutory construction inapplicable in the face of specificity  are far beyond any discernible legislative intent of New York lawmakers. Marriages and single parent households are not, after all, mere social conventions generally or with respect to adoption circumstances; they enjoy legal recognition and special protections for empirically proper social reasons and public policies.
The legislative history of adoption laws over the last century also reveals a dynamic process with an evolving set of limitations. The original version enacted in 1873 provided: "Any minor child may be adopted by any adult" (L 1873, ch 830 [emphasis added]). In 1896, the Legislature cut back by stating that "[a]n adult unmarried person, or an adult husband or wife, or an adult husband and his adult wife together, may adopt a minor" (L 1896, ch 272, § 60; see also, L 1915, ch 352; L 1917, ch 149). This language was further restricted, in 1920, when the Legislature omitted from the statute the language "or an adult husband or wife" (see, L 1920, ch 433). Since enactment of the 1920 amendment, the statute has provided that "[a]n adult unmarried person or an adult husband and his adult wife together may adopt" (Domestic Relations Law § 110 [emphasis added]). The words chosen by the Legislature demonstrate its conclusion that a stable familial entity is provided by either a one-parent family or a two-parent family when the concentric interrelationships enjoy a legal bond. The statute demonstrates that the Legislature, by express will and words, concluded that households that lack legally recognized bonds suffer a relatively greater risk to the stability needed for adopted children and families, because individuals can walk out of these relationships with impunity and unknown legal consequences.
Next, the Legislature specified the exceptions in section 110 permitting a married individual to petition for adoption without consent of the other spouse (see, Domestic Relations Law § 110; McKinney's Cons Laws of NY, Book 1, Statutes § 240 [expressio unius est exclusio alterius  where a statute mentions certain exceptions and omits others, the Legislature intends that the omitted items should be excluded]; Matter of Alonzo M. v New York City Dept. of Probation, 72 N.Y.2d 662, 665; Patrolmen's Benevolent Assn. v City of New York, 41 N.Y.2d 205, 208-209). *674 The failure of the Legislature to provide for the circumstances of these two cases examined in the light of successive particularized legislative amendatory actions, is yet another cogent refutation of the uniquely judicial authorization of adoption, unfurled today under the twin banners of statutory interpretation and ambiguity.
Lastly in this connection, we derive a diametrically different lesson from Matter of Alison D. v Virginia M. (77 N.Y.2d 651), decided in 1991. The majority for that case held that a lesbian partner is not a "parent" under Domestic Relations Law § 70 (a). The Court expressly rejected an expansionist judicial definition of "de facto parent" or "functional" family (id., at 656) and declined to enlarge legislatively limited delineations (id., at 657). Yet, today's majority, only four years later, revives and applies that rejected de facto methodology using another nonstatutory, undelineated term, "second parent adoption" (compare, Simpson v Loehmann, 21 N.Y.2d 305, 314 [Breitel, J., concurring] ["Only a major reappraisal by the court, rather than the accident of a change in its composition, would justify the overruling of" precedent]). The majority now grants legal recognition to what it refers to as functional parents in both cases, the couples comprised of two individuals bound together solely by personally elective affiliation, not by marriage as the statute prescribes. This turnabout should be contrasted again with what the Court in Alison D. actually did: it took a statute at its precise words and gave them effect, because the legally recognized stability of these most sacred human relationships were determined to be paramount by the Legislature and, thus, by this Court.
When the majority augments extant legislation in these cases because the corpus juris does not reflect modern arrangements in which individuals nevertheless yearn to be accorded family status under the law (compare, Matter of Alison D. v Virginia M., supra), it significantly dissolves the central rationale of Alison D. (id.; see also, Simpson v Loehmann, 21 N.Y.2d 305, 314-316, supra [Breitel, J., concurring]). As former Chief Judge Breitel noted in another connection, the "judicial process is not permitted to rove generally over the scene of human affairs. Instead, it must be used, on pain of violating the proprieties, within the framework of a highly disciplined special system of legal rules characteristic of the legal order" (Breitel, The Lawmakers, 65 Colum L Rev 749, 772; see also, Cardozo, The Nature of the Judicial Process, reprinted in Selected Writings of Benjamin Nathan Cardozo, *675 110, 164 [Hall ed 1947] [A Judge "is not a knight-errant, roaming at will in pursuit of his (or her) own ideal of beauty or of goodness."]). The rulings today constitute a rejection of such wise admonitions about appropriate limitations on the judicial process and power.
The Per Curiam opinion of the Court in Matter of Alison D. v Virginia M. (77 N.Y.2d 651, supra) also instructively refrained from any reliance on or reference to Braschi v Stahl Assocs. Co. (74 N.Y.2d 201). Thus, the incorporation of Braschi into the instant cases is inapposite and should be unavailing, because these are very different cases with very different issues and operative policies.

II.
A key societal concern in adoption proceedings is, we all agree, the best interests of children (see, Domestic Relations Law § 114; Matter of Robert Paul P., 63 N.Y.2d 233, 236, supra). The judicial power to grant an adoption cannot be exercised, however, by simply intoning the phrase "the best interests of the adoptive child" as part of the analysis to determine qualification for adoption. That approach bypasses crucial, threshold steps and begs inescapably interwoven questions that must be considered and answered at the outset of the purely statutory construction issue in these cases. Before a court can arrive at the ultimate conclusion that an adoption is in the best interests of a child therefore, it is first obliged to discern whether the particular application is legislatively authorized. Reversing the analysis erects the building before the foundation is in place.
Best interests, in any event, is not an abstract concept floating in a vacuum, but must be factually rooted, supported by and applied to an evidentiary record. With no findings or record in any prior court in these cases on that issue, we fail to understand how the majority here makes first-instance assumptions to assert and support its conclusions about the best interests of Jacob and Dana as part of the statutory construction analysis.
The dual, statutorily interlocked inquiries of qualifications and operation-of-law consequences of adoption cannot be shunted aside in favor of an aspiration that a potential adoptive person might provide a child with good, better or best emotional or financial circumstances. An intuitive preference that a particular adoption might likely or generally serve *676 some child's beneficial interests should not suffice to solve the more comprehensive puzzle of legislative intent that will evolve into a ratio decidendi as the juridical adoption charter to govern the whole of a society (see, Domestic Relations Law § 114; compare, Matter of Bennett v Jeffreys, 40 N.Y.2d 543, 546, 552). We note that the disciplined approach we would use in deciding these appeals does not implicate the bona fides or unchallenged loving and caring motivations and feelings of any of the individuals involved in these cases. While promulgated and applied law may take cognizance of those factors, however, it should not be subordinated to them. Also, these children are not members of a suspect class (contrast, Gomez v Perez, 409 US 535; Plyler v Doe, 457 US 202). They are members of stable homes, already presently in the permanent placement and custody of their biological mothers.
Courts are ultimately limited to viewing issues as presented in litigated cases within the confines of their evidentiary records. Since the majority agrees that the common issue in these cases is purely statutory construction, its reliance on generalized assumptions about life and health insurance, Social Security and death benefits, constitutes a questionable policy makeweight. Those criteria offer scant guidance towards discovering legislative intent behind Domestic Relations Law §§ 110 and 117. Moreover, they are incomplete policy factors, inappropriate to statutory construction analysis, and their imputation in these cases simultaneously eschews consideration of any competing substantial State interest concerns.
For the benefit of the two youngsters and the preservation of some orderly procedural regularity, we draw assurance from the corrective action that at least remits each case to Family Court, to undertake a first instance, best interests hearing in the Jacob case, and an updated hearing in the Dana case, now that three years have transpired since the court conducted its original limited inquiry.

III.
A principal factor in these cases must also ultimately include consideration of the inexorable operation-of-law consequences that flow from section 117, a distinctive feature of New York's adoption laws. Specifically, courts are statutorily mandated to apply Domestic Relations Law § 110 together with the interconnected features of Domestic Relations Law *677 § 117 (compare, e.g., Matter of Royal Indem. Co. v Tax Appeals Tribunal, 75 N.Y.2d 75, 79; McKinney's Cons Laws of NY, Book 1, Statutes § 97).
Domestic Relations Law § 117 provides: "After the making of an order of adoption the natural parents of the adoptive child shall be relieved of all parental duties toward and of all responsibilities for and shall have no rights over such adoptive child or to his [or her] property by descent or succession" (emphasis added). The plain and overarching language and punctuation of section 117 cannot be judicially blinked, repealed or rendered obsolete by interpretation.
Section 117 says that it severs all facets of a biological parent's conjunctively listed relationships upon adoption of the child (compare, Matter of Bennett v Jeffreys, 40 N.Y.2d 543, supra). This Court has recognized that "[t]he purpose of the section [former section 114, now section 117] was to define the relation, after adoption, of the child to its natural parents and to its adopting parents, together in their reciprocal rights, duties and privileges" (Betz v Horr, 276 N.Y. 83, 87; see also, Matter of Gregory B., 74 N.Y.2d 77, 91). That is a critically extant, interpretive proposition from this Court and not some merely atavistic utterance.
In implementation of its prerogative to define family relationships that are accorded legal status, the Legislature even prescribed a stepparent departure from the otherwise automatic section 117 consequence. It thus sought to obviate the inevitable result that an order of adoption might actually effectuate the symbolic Solomonic threat by severing the rights of a consenting biological parent in such specifically excepted circumstances where a biological parent is married to an adopting stepparent. One would have thought promulgation of such an exception unnecessary, yet the Legislature chose certainty of statutory expression for every eventuality as to the severance or nonseverance operation-of-law consequences of section 117.
Appellants in both cases nevertheless propose the theory that section 117 is meant to apply only to inheritance succession of property rights after adoption and should have no effect on the wider expanse and array of rights and responsibilities of a biological parent with an adoptive child. The language of section 117 reveals, however, that the biological parents' duties, responsibilities and rights with respect to the adoptive child are separate and distinct from, and more comprehensive *678 than, a single, narrow category of inheritance rights. The use of the disjunctive "or" before the phrase, "property by descent or succession," cannot be discounted or avoided; it denotes the important and elemental legislative demarcation. These observations are not some syntactical or grammatical exercise. Indeed, syntax and grammar are necessary tools of precise expression, acceptable norms of interpretation and reasonably uniform understanding and, when coupled with disciplined, thorough statutory construction principles, they bear legitimately and cogently on sound and supportable legal analysis (see, Matter of Brooklyn El. R. R. Co., 125 N.Y. 434, 444-445).
Besides, section 117 (1) (i) merely defines a particular class of restricted inheritance rights, namely, "intestate descent and distribution" of property. Thus, adopted children and their biological parents may still inherit from one another by will or acquire property by inter vivos instrument (see, 1986 Report of NY Law Rev Commn, reprinted in 1986 McKinney's Session Laws of NY, at 2560). This again demonstrates that the intestate devolution of property aspect is only a particular species and recent incorporation into this more sweeping, long-standing statute. It does not represent a displacement or total substitution for the statute's predominant purport.
The majority states that "from the very beginning of what is now section 117, both the scholarly commentary about the section and its dozen or so amendments have centered on issues of property rights and inheritance" (majority opn, at 663). This statement sidesteps and subordinates the original and still operative language of section 117 itself: "The parents of an adopted child are, from the time of the adoption, relieved from all parental duties toward, and of all responsibility for, the child so adopted, and have no rights over it" (L 1873, ch 830, § 12 [emphasis added]). Inheritance was not mentioned and the comprehensive sweep of the statute could not be plainer. Finally, the primacy of this Court's precedents and legislatively promulgated words as authority must be accorded greater rank and respect than any secondary or tertiary materials characterized as "scholarly commentary."
Betz v Horr (276 N.Y. 83, supra) is particularly poignant and cogent. There, a sick and destitute adopted adult sought support from her biological father. In rejecting the claim, the Court recognized that the purpose of former section 114 (now § 117) was the complete termination of parental rights and *679 responsibilities of the biological parents following adoption. The Court stated that in order to impose upon the biological parent a duty to support, "it would be necessary to read into section 114 [now section 117] of the Domestic Relations Law an intent to preserve the duty and responsibility of the natural parent to support the child notwithstanding the plain and unambiguous provision that, after adoption, all responsibility of the natural parent for the child ceases" (id., at 88 [emphasis added]; see also, Matter of Harvey-Cook v Neill, 118 AD2d 109, 111). That the biological mothers in these cases may wish that their parental rights not be terminated by an order of adoption is no more determinative than the compelling circumstances of Betz. The statute and our cases remain controlling. Section 117 should not be relegated to, nor was it designed to operate with, case-by-case personal exemptions from universally and equally applied principles of statutory law or precedentially governing authorities.
The rationale of these cases is likely to engender significant legal uncertainty and practical problems between biological and adoptive parents. Conflicts concerning the upbringing of children, for example, with respect to visitation rights, schooling, medical care, religious preference and training and the like, may ensue. Such a net of foreseeable and unseen sequelae is hardly conducive to the settled, permanent, new home environment and set of relationships directed by section 117.
A careful examination of the Legislature's unaltered intent based on the entire history of the statute reveals the original purpose of section 117 was to enfold adoptees within the exclusive embrace of their new families and to sever all relational aspects with the former family. That goal still applies and especially to the lifetime and lifelong relationships of the affected individuals, not just to the effect of dying intestate (see, L 1963, ch 406; Matter of Best, 66 N.Y.2d 151, 156, cert denied sub nom. McCollum v Reid, 475 US 1083; see also, Mem in Support of Bill by Sponsoring Senator Brydges, Bill Jacket, L 1963, ch 406; see also, Mem to Governor in Support by Attorney-General Lefkowitz, Bill Jacket, L 1963, ch 406).
Not surprisingly, we believe that the majority's reliance on Social Services Law § 383-c and Domestic Relations Law §§ 114 and 115-b are inapposite and unpersuasive. The use of these attenuated provisions involving entirely different situations to argue for what amounts to a functional, partial repeal *680 by implication of section 117's unaltered breadth, is a disfavored approach to resolving statutory analysis problems.

IV.
The assembled and varied statutory construction arguments are, in the end, held together by the majority's tincture of constitutional doubt. A crucial utterance illustrates: "[A] construction of the section that would deny children like Jacob and Dana the opportunity of having their two de facto parents become their legal parents, based solely on their biological mother's sexual orientation or marital status, would not only be unjust under the circumstances, but also might raise constitutional concerns in light of the adoption statute's historically consistent purpose  the best interests of the child" (majority opn, at 667 [citations omitted] [emphasis added]). This sweeping amalgam renders doubtful even the opportunity for appropriate statutory amendments to deal with perceived ambiguities. It also tolerates no potential for showing in the future any State interest supporting any enactment regulating this field that could survive equal protection constitutional attack.
This "equal protection" concern was not raised in either case before the lower courts, and the majority's preemptive cloud, coupled with a failure to deal with that issue's complexity, and implicated jurisprudential nuances is perplexing (compare, Campaign for Fiscal Equity v State of New York, 86 N.Y.2d 307, 312, 324, 332, 344). Further, the generalization of some hypothesized result being "unjust under the circumstances" (majority opn, at 667), while a matter of general concern to any Judge, cannot supplant specific analysis and avoid rational basis judicial scrutiny within an appropriate and rigorous adjudicatory process and developed record of pleadings and proof on an as-applied basis. Whatever labels are used, no constitutional issue is squarely and thoroughly presented in these cases anyway, nor is any appropriate for speculation on these records. Moreover, the vagueness as to precisely which parties'  the children or the adopting petitioner or the biological parent  constitutional rights are somehow at risk adds bewilderment to the analysis and frustrates any attempted, precise rejoinder.
Overlaying the entire problem about such projections of facial or applied constitutional doubt, cast upon a complex set of statutes, is the inattentiveness to the fundamental presumption of constitutionality of duly enacted legislation and *681 to the appropriate deference, indeed "supremacy," of the legislative role in this area (see, People v Thompson, 83 N.Y.2d 477, 487-488; Matter of Robert Paul P., 63 N.Y.2d 233, 237, supra, People v Epton, 19 N.Y.2d 496, 505). These overridden precepts should be central to the dispositional equation in these cases instead of a tenuous statutory construction axiom insinuated on a problematical constitutional premise.
Significantly, this Court did not even have the benefit in these cases of the customary adversarial advocacy dynamic. No briefs or oral arguments supportive of the results below or against the arguments for adoptions were presented, though several amici briefs in support of appellants' positions were accepted. Thus, one-sided constitutional claims raised for the first time on appeal should especially be foreclosed from this Court's consideration based on well-settled institutional and precedential principles (see, e.g., People v Gray, 86 N.Y.2d 10, 20; Lichtman v Grossbard, 73 N.Y.2d 792, 794; Melahn v Hearn, 60 N.Y.2d 944, 945; Matter of Eagle v Paterson, 57 N.Y.2d 831, 833; People v Martin, 50 N.Y.2d 1029, 1031; Wein v Levitt, 42 N.Y.2d 300, 306; Cohen and Karger, Powers of the New York Court of Appeals § 169, at 641 [rev ed]; see also, Matter of Patchogue-Medford Congress of Teachers v Board of Educ., 70 N.Y.2d 57, 71 [Simons, J., concurring]). We emphasize that it is the dubiety cast over very significant constitutional propositions in this fashion that is at least as disquieting as an unequivocal constitutional declaration. This is especially so since the Attorney-General of the State was given no notice or opportunity, as required by Executive Law § 71, to fulfill the obligation of the Department of Law to defend the constitutionality  or against the inchoate unconstitutionality  of the beclouded statutes.
The instant two cases also take the constitutional hook of Matter of Patchogue-Medford Congress of Teachers v Board of Educ. (70 N.Y.2d 57, supra), where the assertion of a general constitutional claim in a pleading was used by this Court to reach a specific State constitutional basis for decision, two giant steps beyond that significant jurisprudential outer limit. Now, parties may assert constitutional claims at the final appeal stage and appellate courts may drive a debatable statutory construction wedge  a speculative, future constitutional concern  into the disposition of very significant statutes and cases.
The majority's constitutional prognostication is thus linked *682 to a statutory construction device that teaches courts to avoid reaching constitutional issues when they need not. The rubric is dubiously applied here, however since it is designed primarily to respect the presumption of constitutionality, not becloud it. The presumption is a reservoir of judicial power, preserving judicial capital, resources and power for when they are most and unavoidably needed. The rubric has never been used, as here, to anticipate amorphous doubt over statutes as applied to real, future cases and controversies. By employing a canon of construction to, in effect, reach an unlitigated issue in order to avoid potentially "embarrassing constitutional questions" in the future, the majority in the instant cases violates the very canon it invokes. It ultimately also transgresses another overriding canon, that courts should not legislate under the guise of interpretation (see, e.g., People v Finnegan, 85 N.Y.2d 53, 58; People v Heine, 9 N.Y.2d 925, 929).
The majority concludes that "[g]iven that section 117 is open to two differing interpretations"  a conclusion with which we have already noted our strong disagreement in any event  the Court must construe the statute to avoid constitutional doubt (majority opn, at 667, 667-668, 668, citing principally Matter of Lorie C., 49 N.Y.2d 161, 171). That case dealt with the State constitutional limits on the jurisdiction of the Family Court in placing juvenile delinquents in foster homes. Since the statutory construction issue directly implicated article VI, § 13 of the State Constitution, it is arguably appropriate for the Court to have added a dictum concerning the special court's jurisdictional limits under the State Constitution. As the Court noted, the statutory question involved the "doctrine of distribution of powers `"that each department should be free from interference, in the discharge of its peculiar duties, by either of the others"'" (Matter of Lorie C., supra, at 171, quoting Sexton v Carey, 44 N.Y.2d 545, 549). Here, the would-be constitutional question involves nothing of that kind and does not implicate a powers section of the State Constitution; rather, it forecasts an equal protection "concern."
As the Court has elsewhere observed, failure to raise a constitutional issue in nisi prius courts results in an inadequate record, lack of joinder, and lack of development and testing of adjudicative analysis to permit and justify the appellate court to make its fair, reasonably tested and long-lasting determination and precedent on the merits (see, People v Gray, 86 N.Y.2d 10, 20, supra; *683 People v Martin, 50 N.Y.2d 1029, 1031, supra). Furthermore, if a litigant does not raise a particular legal argument before a court of first instance, that effectively deprives the other party  if there is one, as there is not in these cases  of a fair opportunity to present and answer the proofs and deprives the process of jurisprudence of the essential check-and-balance against unilateral mistake or misapprehension. This Court has also repeatedly warned that "if any unsought consequences result, the Legislature is best suited to evaluate and resolve them" (Bender v Jamaica Hosp., 40 N.Y.2d 560, 562, citing Bright Homes v Wright, 8 N.Y.2d 157; see, Matter of Robert Paul P., 63 N.Y.2d 233, 239, supra). These cautions are uniquely appropriate with respect to the Legislature's concededly "supreme" power and provenance concerning its legal creature: adoptions.
In sum, the common issue here involves a subject on which the Legislature has expressed itself. These cases appear on a screen on which the Legislature has delineated its will and judgment methodically and meticulously to reflect its enactments. Ambiguity cannot directly or indirectly create or substitute for the lack of statutory authorization to adopt. These adoption statutes are luminously clear on one unassailable feature: no express legislative authorization is discernible for what is, nevertheless, permitted by the holdings today. Nor do the statutes anywhere speak of de facto, functional or second parent adoptions. Frankly, if the Legislature had intended to alter the definitions and interplay of its plenary, detailed adoption blueprint to cover the circumstances as presented here, it has had ample and repeated opportunities, means and words to effectuate such purpose plainly and definitively as a matter of notice, guidance, stability and reliability. It has done so before (see, e.g., L 1984, ch 218 [permitting adoption by adults not yet divorced]; L 1951, ch 211 [permitting adoption by a minor]).
Because the Legislature did not do so here, neither should this Court in this manner. Cobbling law together out of interpretative ambiguity that transforms fundamental, societally recognized relationships and substantive principles is neither sound statutory construction nor justifiable lawmaking. Four prior courts in these two cases correctly dismissed the respective adoption petitions. Since those appropriate judicial determinations are based on what the Legislature actually enacted and specifically authorized, the Appellate Division orders should be affirmed.
Order reversed, etc.
NOTES
[1] The dissent's criticisms of our reasoning and methodology are unfounded and undeserved. A careful process of studying the various statutes and their history, in an effort to resolve the novel questions presented, has led us to different conclusions  not unlike courts elsewhere that have confronted this issue and in the main have resolved it as we have (see, In re Tammy, 416 Mass 205, 619 NE2d 315 [1993], supra [permitting second parent adoption]; In re B.L.V.B., 160 Vt 368, 628 A2d 1271 [1993] [permitting second parent adoption]; In re M.M.D., 662 A2d 837 [DC 1995] [permitting second parent adoption]; but see, In re Angel Lace M., 184 Wis 2d 492, 516 NW2d 678 [1994]).
[2] Though the adoption petition in Matter of Jacob was filed jointly on behalf of appellant Stephen T. K. and Jacob's biological mother in "an understandable effort to cover all the bases" (In re M.M.D., 662 A2d 837, 843, supra), the fact that appellants chose this procedural route should not preclude Stephen T. K.  an adult unmarried person  from adopting Jacob.
[3] By interpreting the language regarding married couples in section 110 as expansively as it does, the dissent would prohibit adoptions in whole categories of cases not before us  for example, when two unmarried adults seek to adopt a child who is the biological child of neither of them (see, e.g., In re M.M.D., 662 A2d 837, supra)  thereby decreasing the number of persons eligible to adopt children deemed "hard-to-place" due to circumstances such as behavioral problems, birth defects or serious illnesses.
[4] The two appeals before us concern adoptions by second parents, not adoptions by "any number of people who choose to live together" (dissenting opn, at 672-673). Similarly, our decision today does not mandate judicial approval of second parent adoptions in all situations, but simply permits them to take place when appropriate (see, Domestic Relations Law § 114).
[5] This long-standing and widely recognized principle of statutory construction is invoked merely as an additional interpretive aid  a pathway of analysis  in the difficult task of choosing among possible readings of a statute (see, Matter of Lorie C., 49 N.Y.2d 161, 171; International Fuel & Iron Corp. v Donner Steel Co., 242 N.Y. 224, 231). In answering the question posed  what does the statute mean?  we use all available and appropriate analytical tools.

Despite the dissent's assertions to the contrary, we are not declaring section 117 unconstitutional, but instead interpreting it in a practical, commonsense manner which conserves judicial resources and avoids the awkward alternative of "giving [it] an interpretation which might precipitate embarrassing constitutional questions" in the future (Hovey v De Long Hook & Eye Co., 211 N.Y. 420, 429; see also, Matter of Cipolla v Golisano, 84 N.Y.2d 450, 455).